**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| CONSTAR INTERNATIONAL INC., et al.,[1] | ) Case No. 11-_____ (____) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

### DECLARATION OF J. MARK BORSETH, CHIEF FINANCIAL OFFICER OF CONSTAR INTERNATIONAL INC., IN SUPPORT OF FIRST DAY PLEADINGS

J. Mark Borseth, hereby declares as follows:

1.      I am the Chief Financial Officer and Executive Vice President of Constar International Inc., a corporation organized under the laws of the State of Delaware ("Constar") and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I have served as Chief Financial Officer of Constar International Inc. since September 23, 2009.  In this capacity, I am familiar with the Debtors' day-to-day operations, business and financial affairs and books and records.

2.      As the Chief Financial Officer and Executive Vice President of Constar, I am one of the officers of the Debtors responsible for devising and implementing the Debtors' business plans and strategies, and overseeing the Debtors' financial and operational affairs.  In addition, I am responsible for supervising the maintenance of the Debtors' books and records.  Moreover, in these capacities, I have been involved in the

---

[1] The Debtors and the last four digits of their respective tax identification numbers are:  Constar International Inc. (XX-XXX9304), BFF Inc. (XX-XXX1229), DT, Inc. (XX-XXX7693), Constar, Inc. (XX-XXX0950), Constar Foreign Holdings, Inc (XX-XXX8591) and Constar International U.K. Limited.  The address of Constar International Inc., BFF Inc., DT, Inc., Constar, Inc. and Constar Foreign Holdings, Inc. is One Crown Way, Philadelphia, Pennsylvania  19154.  The address of Constar International U.K. Limited is Moor Lane Trading Estate, Sherburn in Elmet, Nr Leeds, North Yorkshire LS25 6ES, UK.

Debtors' restructuring process (the "Restructuring"), including, inter alia, (a) participating in the development, negotiations and implementation of various strategic alternatives for restructuring, reducing or modifying the Debtors' indebtedness; (b) managing professionals engaged by the Debtors in connection with the Restructuring; (c) supervising the preparation of the documentation necessary to implement the Restructuring; and (d) consulting, on a regular basis, with the Debtors' officers, executives, and Board of Directors or their equivalent, with respect to the foregoing.

3.      On the date hereof (the "Petition Date"), the Debtors commenced voluntary cases (the "Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

4.      To enable the Debtors to minimize the adverse effects of the commencement of the chapter 11 cases on their businesses as they pursue confirmation of their pre-arranged chapter 11 plan efforts, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Pleading").  Each First Day Pleading seeks relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession in the chapter 11 cases.

5.      I am familiar with the contents of each First Day Pleading (including the exhibits thereto) and I believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value.  The approval of the First Day Pleadings would assist the

Debtors in achieving a successful reorganization and serves the interests of the Debtors' estates and creditors.

6.     I submit this Declaration in support of the First Day Pleadings pursuant to Rule 1008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"). Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents or information supplied to me by other members of the Debtors' management and professionals.  I am authorized to submit this Declaration on behalf of the Debtors, and if called upon to testify, I could and would testify competently to the facts set forth herein.

7.     This Declaration is divided into two main sections.  Part I contains a discussion of the nature of the Debtors' business operations and the circumstances leading to the commencement of the chapter 11 cases.  Part II contains a brief discussion of the First Day Pleadings filed by the Debtors.

**<u>PART I</u>**

**<u>Business of the Debtor</u>**

8.     Constar, headquartered in Philadelphia, Pennsylvania, and its subsidiaries, are a leading global producer of polyethylene terephthalate ("<u>PET</u>") plastic containers, with more than 850 employees and operations in the United States and Europe.  Constar produces PET plastic containers for conventional PET applications, such as for soft drinks and water, and custom PET containers designed for food, juices, teas and sport drinks.

9.     Constar manufactures PET containers for two product types:  conventional PET and custom PET.  The conventional PET container business consists of high volume

production of containers for use in packaging soft drinks and water.  For the first nine months of 2010, conventional PET products represented approximately 69% of Constar's net sales.  Custom PET container applications include food, juices, teas and sport drinks. The containers for custom PET applications often employ more complex manufacturing processes, unique materials, innovative product designs and technological know-how. Approximately 26% of Constar's net sales in the first nine months of 2010 related to custom PET containers.  The remainder of Constar's net sales during this nine month period related to the sale of plastic closures.

10.      Constar's contracts are generally requirements-based, granting all (or a percentage of) the customer's actual requirements for a particular period of time, instead of a specific commitment for unit volume. The typical term for Constar's customer supply contract is three to four years.  Constar's largest customer is Pepsi-Cola Advertising and Marketing, Inc. ("Pepsi").  Constar's contract with Pepsi expires on December 31, 2012.

11.      The primary raw material and component cost of Constar's products is PET resin, a commodity available globally.  The price Constar pays for PET resin is subject to frequent fluctuations resulting from changes in the cost of raw materials used to make PET resin, which are affected by prices of natural gas and oil and its derivatives in the United States and overseas markets, normal supply and demand influences, and, to a lesser extent, seasonal demand.  Substantially all of Constar's sales are made pursuant to mechanisms that allow for the pass-through of changes in the price of PET resin to its customers.

**Corporate Structure of the Debtors**

12.     Constar is the parent of four wholly-owned subsidiaries: BFF Inc., a Delaware corporation, DT, Inc., a Delaware corporation, Constar, Inc., a Pennsylvania corporation, and Constar Foreign Holdings, Inc., a Delaware corporation ("Holdings"). Holdings, in turn, is the parent of three wholly-owned foreign subsidiaries: Constar International Holland (Plastics) B.V., a Dutch *besloten vennootschap* ("Constar Holland"), Constar Plastics of Italy S.r.l. ("Constar Italy"), an Italian *società responsabilità limitata*, and Constar International U.K. Limited, a United Kingdom limited company ("Constar UK").

13.     Constar was an independent publicly-held corporation from 1969 until 1992, when it was purchased by Crown Cork & Seal Company, Inc. ("Crown") and became a wholly-owned subsidiary of Crown. On November 20, 2002, Crown sold 10.5 million shares of its stock in Constar, comprising most of its equity in the company, through an initial public offering (the "IPO"). As described below, since its IPO, Constar has always been a public company and its common stock is listed on the NASDAQ Capital Market under the symbol "CNST."

14.     On May 29, 2009, as described below in more detail, in connection with the consummation of its Second Amended Joint Plan of Reorganization Pursuant to chapter 11 of the United States Bankruptcy Code (the "Plan"), Constar cancelled its then-outstanding common stock and issued new common stock in accordance with the Plan. As of January 6, 2010, 1,750,000 shares of Constar's common stock were issued and remain outstanding.

**Prepetition Indebtedness**

15.     The Senior Secured FRNs. On February 11, 2005, Constar completed a refinancing which consisted of the sale of $220 million aggregate principal amount of

Senior Secured Floating Rate Notes due 2012 (the "Senior Secured FRNs"). The Senior Secured FRNs, which are outstanding, bear interest at a rate of LIBOR plus 3.375%, with interest payable quarterly and principal maturing February 15, 2012.[2] Constar's obligations under the Senior Secured FRNs are guaranteed by all of Constar's U.S. subsidiaries and its U.K. subsidiary. Substantially all of Constar's property, plants and equipment are pledged as collateral to the Senior Secured FRNs.

16. The GE Credit Facility. On February 11, 2010, Constar entered into a revolving credit facility (the "GE Credit Agreement") with General Electric Capital Corporation ("General Electric") and terminated its then existing credit agreement with Citicorp N.A. The GE Credit Agreement was amended on August 12, 2010. As amended, the GE Credit Agreement provides for up to $75 million of available credit, with a sublimit of up to $20 million for the issuance of letters of credit. Availability under the GE Credit Agreement is limited to a borrowing base calculated as a sum of eligible accounts receivable plus eligible inventory value less certain reserves and adjustments. As of November 30, Constar's borrowing base under the GE Credit Agreement was approximately $46.5 million and its available credit was approximately $15.6 million.

17. Constar pays monthly a commitment fee equal to 0.75% per year on the undrawn portion of the GE Credit Agreement. The effective interest rate for loans under the GE Credit Agreement as of November 30, 2010 was 6.5%. Letters of credit carry an

---

[2] In 2005, Constar entered into an interest rate swap (the "Swap Agreement") for a notional amount of $100 million under which Constar exchanged its floating interest rate for a fixed rate of 7.9%. On February 11, 2010, the counterparty to the Swap Agreement novated its rights under the Swap Agreement to a third party. The fixed payment of the Swap Agreement was also modified from the previous fixed rate of 7.9% to a new fixed rate of 8.17%. Pursuant to the agreement with the majority of the holders of the Senior Secured FRNs discussed below, the Swap was terminated on January 5, 2011.

issuance fee of 0.25% per annum of the outstanding amount and a monthly fee accruing at a rate per year of 4% of the average daily amount outstanding.

18.     The GE Credit Agreement's scheduled expiration date is February 11, 2013. However, the GE Credit Agreement may terminate earlier if Constar's Senior Secured FRNs are not refinanced at least 90 days prior to their scheduled due date of February 15, 2012, or in the case of an event of default.

19.     As of January 4, 2011, the Debtors' prepetition indebtedness for borrowed money consisted of:

- $220 million in principal amount of debt consisting of the Senior Secured FRNs;

- Approximately $15.8 million of outstanding borrowings under the GE Credit Agreement;

- Approximately $3.7 million outstanding under undrawn letters of credit; and

- Approximately $10 million owed by Constar UK to Constar Holland.

### Events Leading Up to the Debtors' Chapter 11 Filings

20.     <u>Constar's Prior Restructuring Effort</u>.  In the fall of 2008, Constar determined that it had more leverage than its then-current operations could support.  As a result, Constar and its representatives began discussions with certain holders of its then-outstanding 11% Senior Subordinated Notes due 2012 (the "<u>Senior Subordinated Notes</u>") with respect to possible restructuring alternatives.  These discussions led to the formation of an ad hoc committee of holders of the Senior Subordinated Notes and ultimately resulted in the negotiation of a pre-arranged Plan, which among other things, (a) provided for the conversion of the Senior Subordinated Notes into all of the equity of the reorganized entities, excluding those shares reserved for Constar's management, while (b) leaving the Debtors' trade vendors and the holders of the Senior Secured FRNs

unimpaired.  The Debtors launched the approval process for this Plan by commencing chapter 11 cases in this Court on December 30, 2008.  The Plan was confirmed on May 14, 2009 and became effective on May 29, 2009.

21.     <u>Decline in Demand</u>.  Over the past eighteen months, demand for Constar's conventional PET products has decreased significantly due to a shift to self-manufacturing by Pepsi, which has notified Constar of its intention to increase its self-manufacturing of conventional containers and, consequently, to reduce its requirements for bottles under its supply agreement with Constar.  The Company expects the trend of self-manufacturing of containers for carbonated soft drinks to continue, and that, over time, a transition to more and more self-manufacturing of plastic bottles at locations with high transportation costs, large volume and space to install blow-molding equipment will occur.  In addition, sales volumes have continued to decline generally and Constar has not been able to offset decreases to conventional PET business by increasing its custom business.  As a result of these and other factors, Constar's liquidity has been constrained, which has caused certain vendors to require that Constar pay for purchases in advance, upon delivery, or on shortened credit terms, or to require letters of credit, further constraining liquidity.  These liquidity constraints have created customer concern about the Company's long term viability, which has made it difficult to renew contracts or obtain new business.

22.     In sum, Constar is now in a position where, even with the more deleveraged balance sheet which resulted from the 2009 restructuring, it does not now believe it can pay off or refinance the Senior Secured FRNs when they mature and maintain adequate liquidity under the GE Credit Agreement to operate its business.

Exacerbating the situation is that several critical vendors have reacted negatively to Constar's most recent filings and have demanded reduced credit terms, letters of credit or cash in advance terms prior to shipping their product to Constar. Those demands have put extreme pressure on the GE Credit Agreement and have created further cash drains on Constar and its subsidiaries.

**Development of Proposed Plan**

23.     As a result of the developments outlined above, in July 2010, the Debtors retained Greenhill & Co., LLC as its financial advisor to assist in exploring strategic alternatives and entered into discussions with certain holders of the Senior Secured FRNs (the "Consenting Noteholders"). On or about January 7, 2011, the Debtors and the Consenting Noteholders reached an agreement in principle on the terms of a restructuring whereby Constar and certain of its subsidiaries would file prearranged chapter 11 bankruptcy cases (a) designed to convert most of the Senior Secured FRN indebtedness into equity (leaving those holders with only a relatively modest amount of new debt), and (b) providing for the Company's quick emergence from chapter 11 on this further deleveraged basis.

24.     The Debtors and the holders of at least two thirds of the principal amount of the Senior Secured FRNs subsequently entered into a restructuring support and lock-up agreement (the "Restructuring Support Agreement"), attached hereto as Exhibit A, memorializing their agreement. The Restructuring Support Agreement attaches and incorporates the Debtors' proposed Plan, which incorporates the restructuring contemplated by the Debtors' initial agreement with the Consenting Noteholders. The Restructuring Support Agreement provides that as long as the agreement is in effect, the holders of the Senior Secured FRNs that are parties to the Restructuring Support

Agreement will support the proposed Plan, including by timely executing and delivering ballots accepting the Plan. The Restructuring Support Agreement further provides that the agreement may be terminated upon material breach of the agreement or the failure to satisfy certain conditions or meet certain deadlines in connection with these bankruptcy cases, including the failure to obtain approval of the DIP facility, the Disclosure Statement, or the Plan by certain deadlines set forth in the agreement.

25.    Importantly, one or more of the holders of the Senior Secured FRNs have committed to provide debtor in possession financing, a portion of which, upon the satisfaction of certain conditions, may be rolled over (at the election of the provider(s)) into financing that will continue to be available to Constar after it emerges from bankruptcy. The debtor in possession financing will be used to refinance and payoff the GE revolving credit facility and for working capital and operational expenses.

26.    As a result of the foregoing developments, the Debtors have filed this day (the "Petition Date") (a) their bankruptcy petitions, (b) first day pleadings relating to relief needed in connection with these bankruptcy filings, (c) Debtors' proposed disclosure statement regarding the pre-arranged plan of reorganization, and (d) a motion for an order setting a hearing date with respect to the proposed disclosure statement.

27.    The Debtors intend to prospectively maintain their operations on a "business as usual" basis during the pendency of these chapter 11 cases.

## PART II

### First Day Pleadings

28.    I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Pleadings, (b) the need for the Debtors to continue to effectively operate, and (c) the negative effects if the Debtors do not obtain the

requested relief. My opinions are based upon my first-hand experience as Chief Financial Officer and Executive Vice President of Constar for the past 15 months and through my review of various materials and information, discussions with other executives of the Debtors, and discussions with the Debtors' outside advisors.

29.     I reviewed each of the First Day Pleadings and participated in the preparation thereof. I believe, to the best of my knowledge, that the facts set forth in the voluntary petitions and the First Day Pleadings are true and correct. This representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. Based upon the foregoing, if called to testify, I could and would, testify competently to the facts set forth in each of the First Day Pleadings.

30.     The relief sought in the First Day Pleadings will minimize the adverse impact of these cases on customers, employees and suppliers, while allowing the Debtors to maximize value for their creditors. I believe that the relief sought in the First Day Pleadings is necessary to enable the Debtors to operate effectively as chapter 11 debtors-in-possession.

31.     Several of the First Day Pleadings request authority to pay certain prepetition claims. Rule 6003 of the Federal Rules of Bankruptcy Procedure provides that "except to the extent relief is necessary to avoid immediate and irreparable harm," the court shall not consider motions to pay prepetition claims during the first 20 days after the filing of a petition. As set forth in more detail below, the Debtors have narrowly tailored their requests for authority to pay prepetition claims to those circumstances

where the failure to pay such claims would bring immediate and irreparable harm, or which would otherwise be entitled to administrative priority under the Bankruptcy Code.

<b><u>Administrative Motions</u></b>

<b>A.     <u>Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases</u></b>

32.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these chapter 11 cases will jointly affect all of the Debtors. For this reason, the Debtors believe that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these chapter 11 cases. The Debtors further believe that in order to optimally and economically administer the Debtors' pending chapter 11 cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to Constar International Inc. The Debtors believe that joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, the Debtors believe that the relief requested by this motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee. For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

<b>B.     <u>Motion of the Debtors for an Order Extending Time for Debtors To File Their Schedules and Statement of Financial Affairs and List of Equity Security Holders</u></b>

33.     The Debtors have requested that the Court extend by an additional 30 days, the date by which the schedules of assets and liabilities (the "<u>Schedules</u>") and

statements of financial affairs (the "<u>SOFAs</u>") must be filed, pursuant to Bankruptcy Rule 1007. Since the Debtors' creditor body exceeds 300, the Debtors' Schedules Deadline is automatically set at February 10, 2011. Given the complexity and diversity of their operations, the Debtors may theoretically be unable to complete their Schedules and SOFAs by the Schedules Deadline. Given the substantial burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, the limited number of employees available to collect the information and the competing demands upon such employees, the Debtors submit that "cause" exists to extend, prophylactically, the Schedules Deadline by an additional thirty (30) days, through and including March 14, 2011. The requested extension and waiver will enhance the accuracy of the Debtors' Schedules and SOFAs and avoid the necessity of substantial subsequent amendments.

**C.** **Debtors' Motion for an Order Pursuant to Bankruptcy Rules 2002(l), 2002(m) and 9007 to Establish Notice Procedures and to Establish a Master Service List**

34. The Debtors have requested that this Court enter an order providing for certain notice, hearing and other case management procedures for these chapter 11 cases. Requiring that service be made upon each potential party in interest would be a waste of the Debtors' limited resources. Thus, the Debtors believe that any party in interest who wishes to receive notice of pleadings filed in these chapter 11 cases shall file a written notice of appearance and request for service of papers, which shall include such party's (i) name; (ii) address; (iii) name of client, if applicable; (iv) telephone number; (v) facsimile number; and (vi) if such party opts to be served by email, an email address.[3] The Debtors will maintain a list (the "<u>2002 Service List</u>") of all such requests received

---

[3] Parties who include more than one email address in their 2002 Notice must designate only one email address as the official email address for effectuating service. The additional email addresses will be added to the 2002 Service List for informational purposes only.

from parties in interest (the "2002 Notices") and will update the 2002 Service List as

often as practicable, but in no event less frequently than every ten (10) business days.

Every time the 2002 Service List is updated, the Debtors will file it and will post it on the

web site of Kurtzman Carson Consultants LLC, their claims and noticing agent. All

pleadings and documents filed with the Court in these chapter 11 cases, including the

initiation of adversary proceedings, will be served via first class mail or, for those parties

who have consented to e-mail service, by e-mail, on the 2002 Service List. This will be

efficient and save the estates significant time and mailing/copying expense. Additionally,

due to the likely volume of motions and other pleadings that will be filed in these cases,

the Debtors propose that such special hearing procedures be created, including the

creation of regularly scheduled omnibus hearings at which the Court, the Debtors and

other main parties in interest can address several motions at once. The Debtors believe

that these procedures will avoid the substantial time and expense of scheduling separate

hearings on each discrete matter.

### Financing Motions

**D.**     **Motion of the Debtors for Orders (A) Authorizing the Debtors to Enter into Postpetition Note Purchase Agreement and Obtain Postpetition Financing, (B) Approving a Stipulation Authorizing and Restricting the Use of Cash Collateral Pending Final Approval of Postpetition Financing, (C) Providing Adequate Protection, Granting Liens and Superpriority Claims, (D) Authorizing Debtors to Repay Prepetition Credit Agreement Obligations, (F) Modifying the Automatic Stay and (G) Scheduling a Final Hearing**

35.     By this motion, the Debtors request that the Court (i) authorize the

Debtors to obtain postpetition financing pursuant to sections 363 and 364 of the

Bankruptcy Code by executing and entering into that certain Senior Secured Priming

Super-Priority Debtor in Possession Note Purchase Agreement (the "DIP Note Purchase Agreement"), by and among Constar, BFF Inc., DT, Inc., Constar, Inc., and Constar Foreign Holdings, Inc., (the "Issuers"),[3] the other note parties thereto, Black Diamond Commercial Finance, L.L.C., as agent for all purchasers (the "DIP Agent"), and the purchasing institutions party thereto (the "DIP Facility Providers"), up to an aggregate principal amount of $55 million (the "DIP Facility"); (ii) authorize the Debtors to grant mortgages, security interests, liens and superpriority claims (pursuant to sections 364(c)(1), (2), and (3) and 364(d) of the Bankruptcy Code) to the DIP Agent acting on behalf of, and for the benefit of, itself and the DIP Facility Providers; (iii) authorize the Debtors to grant the DIP Facility Providers, pursuant to section 364(c)(1) of the Bankruptcy Code, priority in payment with respect to the obligations under the DIP Note Purchase Agreement over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than in respect of the Carve Out (as defined in the DIP Note Purchase Agreement); (iv) pending entry of a final order (the "Final Order"), authorize the Debtors to obtain emergency postpetition financing under the DIP Note Purchase Agreement as set forth in the interim order attached to the Motion (the "Interim Order"); (v) authorize the Debtors upon entry of the Interim Order to repay their obligations under the GE Credit Facility, excluding the L/C Obligations (defined below); (vi) authorize the Debtors, upon entry of the Interim Order, to retain the letter of credit facility under the GE Credit Facility and cash collateralize (such cash collateral being the "L/C Cash Collateral") each undrawn letter of credit issued under the

---

[3] Debtor Constar International U.K. Limited is not and shall not be an Issuer under or party to the DIP Note Purchase Agreement. Reference herein to the Debtors in their capacity as Issuers under the DIP Note Purchase Agreement shall not include Constar International U.K. Limited. **[confirm whether Constar UK is signatory]**

-15-

GE Credit Agreement (the "Prepetition Letters of Credit"), in each case, in an amount equal to 105% of the face amount of such letter of credit (the "L/C Obligations"); (vii) authorize the Debtors, upon entry of the Interim Order, to provide adequate protection to (A) the holders of the Senior Secured FRNs issued pursuant to that certain Indenture (the "FRN Indenture") dated as of February 11, 2005, by and among Constar, as issuer, the guarantors party thereto, and the Bank of New York, as indenture trustee (the "FRN Indenture Trustee") and (B) the FRN Indenture Trustee; (viii) approve and authorize the Debtors to execute and deliver the Cash Collateral order (the "Cash Collateral Order") between the Debtors and the Prepetition Secured Lenders, authorizing the Debtors to use the cash collateral of the Prepetition Secured Lenders (the "GE Cash Collateral"); (ix) modify the automatic stay under section 362 of the Bankruptcy Code; (x) prescribe the form and manner of notice and setting the time for the final hearing on the Motion (the "Final Hearing"); and (xi) grant such further and other relief as this Court deems appropriate and just.

36. The Debtors' determination to enter into, and seek court approval of, the DIP Facility is the result of a thorough marketing process. In over six weeks, the Debtors contacted nine potential debtor-in-possession ("DIP") lenders, executed non-disclosure agreements with eight potential DIP lenders, and received and evaluated three proposals. None of these proposals, other than the DIP Facility, however, provided the Debtors with sufficient financing to fully cover their projected postpetition financing needs without using the Senior Secured FRNs' collateral on terms that were deemed acceptable to the Senior Secured FRN holders (the "FRN Holders"). Indeed, these proposals were short of the projected necessary financing by up to $15 million. In light of this market feedback

and to ensure that the Debtors were able to successfully restructure, certain of the Debtors' existing noteholders representing a substantial portion of the Debtors' capital structure provided the Debtors with a DIP financing proposal that the Debtors believe provides them with sufficient liquidity to cover their postpetition expenses at a reasonable cost. In addition, the proposed DIP Facility will allow the Debtors to pay off their existing revolver and roll-over up to $15 million into post-emergence exit financing. In light of these circumstances, the Debtors submit that the proposed DIP Facility is fair and reasonable and in the best interests of the Debtors' estates and creditors.

37. On the Petition Date, the Debtors commenced these chapter 11 cases to effectuate a pre-arranged balance-sheet restructuring. The Debtors have filed a Plan that provides for the deleveraging of the Debtors and a quick emergence by the Debtors from chapter 11 by, among other things, refinancing the GE Credit Facility and converting (i) the Senior Secured FRNs into new notes in the amount of $70 million and 100% of certain new overage securities, and (ii) general unsecured claims (including the deficiency claims of the FRN Holders) into 100% of certain new common stock (subject to dilution on account of a management incentive plan). The Debtors and the Consenting Noteholders have entered into a Restructuring Support Agreement memorializing this agreement.

38. Prior to the Petition Date, the Debtors were party to that certain $75 million GE Credit Facility. In addition, Constar had issued the Senior Secured FRNs pursuant to the FRN Indenture. The obligations of the Debtors under the GE Credit Agreement are secured by all of the stock of Constar Inc. and Constar's domestic and United Kingdom subsidiaries, 65% of the stock of its other foreign subsidiaries and all of

the Debtors' cash, inventory, accounts receivable, investment property, instruments, chattel paper, documents, deposit accounts and intangibles of Constar Inc., Constar and its domestic and United Kingdom subsidiaries (the "<u>GE Credit Agreement Collateral</u>"). The Debtors' obligations under the Senior Secured FRNs are also guaranteed by Constar and by all of Constar's domestic and United Kingdom subsidiaries, as well as secured by liens on substantially all of the Debtors' property, plants, and equipment (the "<u>FRN Collateral</u>").

39.     The Debtors and their advisors conducted a thorough marketing process that solicited proposals for refinancing the prepetition secured debt. Recognizing that the restructuring might have to be implemented through an in-court process, the Debtors also solicited proposals for DIP financing commitments.

40.     The Debtors, in consultation with advisors to certain FRN Holders, evaluated the numerous proposals they received over the course of the marketing process. Based on the availability of collateral to secure a DIP facility, each of these proposals left the Debtors with a minimum $15 million financing shortfall and failed to cover the Debtors' projected postpetition financing needs without the support of the collateral pledged to the FRN Holders. With the benefit of this market feedback from advisors to the FRN Holders that their clients were not willing to be primed, and discouraged with the proposals received to that point, the DIP Facility Providers, comprising certain FRN Holders and their affiliates, proposed their own financing alternative that included a DIP financing commitment of up to $55 million (including $15 million of new availability). After negotiating the DIP financing commitment with advisors to and with FRN Holders, the proposal represents favorable terms for the DIP Facility. In addition, the DIP Facility

was structured to allow each and every Senior Secured FRN Holder not only the right but also the ability to participate. The Debtors ultimately selected the DIP Facility because it was the best, and only satisfactory, proposal.

41. Beginning in December 2010, the Debtors and the DIP Facility Providers negotiated the terms of the DIP Note Purchase Agreement, the Interim Order, and related documents. The proceeds to be provided pursuant to the DIP Facility will be used pursuant to an agreed-upon budget (the "Budget") during the period covered by the Interim Order to (i) cash collateralize outstanding letters of credit under the GE Credit Agreement, (ii) repay all other obligations under the GE Credit Agreement other than the L/C Obligations (the "GE Credit Agreement Obligations"), and (iii) provide an additional $15 million of working capital for the Debtors. The remaining available proceeds of the DIP Facility not used prior to the Final Hearing, to the extent authorized pursuant to the Final Order, will be used pursuant to a budget to provide additional working capital for the Debtors.

42. The Debtors require immediate access to the additional liquidity provided by the DIP Facility to ensure that the Plan remains on course and to ensure that the Debtors' operations are not adversely affected. Specifically, the Debtors have an urgent need to use cash collateral and obtain DIP financing for, among other things, continuing the operation of their businesses in an orderly manner, maintaining business relationships with vendors, suppliers, and customers, paying employees, and satisfying other working capital and operational needs—all of which are necessary to minimize disruption to the Debtors' business operations and ensure that the Debtors can consummate their balance-sheet restructuring. The DIP Facility Providers, however, are unwilling to provide such

additional liquidity prior to the repayment of the GE Credit Agreement Obligations as provided in the Interim Order. Accordingly, the Debtors hereby move on an expedited basis for entry of the Interim Order, authorizing the Debtors to obtain DIP financing and to repay the GE Credit Agreement Obligations in light of the immediate and irreparable harm that the Debtors' estates likely will suffer if the relief requested is not granted.

43. In the event that this Court does not enter the Interim Order or otherwise authorize the Debtors to repay the GE Credit Agreement Obligations and thereby obtain access to the DIP Facility on an emergency basis, the Debtors request that this Court authorize the Debtors to use the GE Cash Collateral pending a Final Hearing on this motion. The Cash Collateral Order will permit the Debtors to use the GE Cash Collateral until the entry of a Final Order granted the relief requested herein.

44. After extended good faith, arm's-length negotiations, the DIP Facility Providers agreed to provide the DIP Facility on the terms provided in the DIP Note Purchase Agreement as summarized above. The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to support them through the pendency of these Cases, will be used (a) to repay the obligations under the GE Credit Facility and cash collateralize the Prepetition Letters of Credit, (b) for general working capital and other purposes permitted under the DIP Note Purchase Agreement, (c) to fund the costs of administering these chapter 11 cases, and (d) to pay all fees and expenses provided under the DIP Note Purchase Agreement and authorized by the Court.

45. Additionally (and importantly), up to $15 million of the new DIP monies will be, subject to certain conditions, convertible into new notes on the effectiveness of the Plan, which should facilitate the Debtors' expeditious emergence from chapter 11.

Furthermore, the DIP Note Purchase Agreement is an important part of a larger deal, as evidenced by the Restructuring Support Agreement, pursuant to which the Consenting Noteholders have agreed to support a plan of reorganization with substantial economic and non-economic benefits to the Debtors' estates.

46.     The Debtors' execution of the DIP Note Purchase Agreement is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors projected financing needs during the pendency of any chapter 11 case, and determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities.  Accordingly, the Debtors negotiated the DIP Note Purchase Agreement with the DIP Facility Providers in good faith, at arm's-length, and with the assistance of outside counsel, in order to obtain the required postpetition financing on terms favorable to the Debtors.  Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative— indeed, it was the only proposal that met the Debtors' postpetition financing needs..

47.     Specifically, the DIP Facility will provide the Debtors with access to $38 million immediately after entry of the Interim Order and up to an aggregate of $55 million after entry of the Final Order, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases.  In addition, subject to the terms of the DIP Note Purchase Agreement, the DIP Facility Providers

have agreed that up to $15 million of the borrowings under the DIP Note Purchase Agreement may be converted into new notes upon the effective date of the Plan.

48.     The Debtors negotiated the DIP Facility as part of their larger discussions with the Consenting Noteholders regarding a consensual restructuring of the Debtors' principal prepetition obligations.  The Consenting Noteholders have overwhelmingly voted to support the Restructuring Support Agreement, which resulted from those discussions.  The DIP Facility is a reflection of the cooperation among the Debtors and the Consenting Noteholders. Accordingly, entering into the DIP Note Purchase Agreement constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

49.     The DIP Facility resulted from an extensive prepetition marketing process conducted by the Debtors' financial advisors.  The alternative proposals all left the Debtors with a $15 million financing shortfall, and the DIP Facility was the only proposal that covered all of the Debtors' projected postpetition financing needs on terms that were deemed acceptable to the FRN Holders.  Indeed, the DIP Facility Providers only submitted their proposal after the Debtors were unable to obtain adequate postpetition financing in the form of unsecured credit, an administrative expense, or credit secured solely by junior liens on the Debtors' assets.  Finally, the Consenting Noteholders, who represent a substantial portion of the FRN Holders, have consented to the DIP Note Purchase Agreement, the motion, and the relief requested herein as reflected by the Restructuring Support Agreement.  Accordingly, the Debtors respectfully submit that their efforts to obtain postpetition financing satisfy the standard required under section 364(c) of the Bankruptcy Code.

50.     As described above, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Facility Providers offered the only viable option for obtaining the postpetition financing the Debtors require.  The Debtors conducted arm's-length negotiations with the DIP Facility Providers regarding the terms of the DIP Facility and the DIP Note Purchase Agreement, and the DIP Note Purchase Agreement reflects the most favorable terms on which the DIP Facility Providers were willing to offer financing.  The Debtors are otherwise unable to obtain financing other than financing secured by first priority priming liens, and on that basis, of the proposals they received, none but the DIP Facility and the DIP Note Purchase Agreement provided enough liquidity to meet the Debtors' postpetition needs.

51.     In addition, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Facility and the use of the cash collateral, the Debtors will be unable to operate their business or prosecute their chapter 11 cases, and may be required to immediately shut down their operations, which will threaten the Debtors' significant going concern value. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

52.     Finally, the DIP Facility will provide the Debtors with access of up to $55 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases.  Accordingly, the terms of the DIP Facility are

reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

53.     The Debtors will provide adequate protection for the interests of the FRN Holders in the FRN Collateral.  The Debtors propose, as adequate protection for any diminution in the value of the FRN Collateral from and after the Petition Date, (a) the FRN Holders shall receive second priority liens on all existing and future tangible and intangible assets of the Debtors subject only to the Carve Out and the security interests and liens securing the DIP Facility and (b) reimbursement of the reasonable fees and expenses of the Consenting Noteholders and the FRN Indenture Trustee.  To the extent such replacement liens are insufficient to provide adequate protection, the holders of the Senior Secured FRNs shall have adequate protection claims arising under § 507(b) of the Bankruptcy Code, which claims shall be junior to the DIP Facility claims and shall be payable from and have recourse to all assets and property of the Issuers and Constar U.K. Moreover, the DIP Facility was structured to allow each and every Senior Secured FRN Holder the right to participate and receive priority DIP Facility claims.  In exchange for, and in reliance on, this adequate protection, the Consenting Noteholders have consented to the priming of their prepetition liens.

54.     It is essential that the Debtors immediately stabilize their operations and cash flow, which will maximize the potential for a successful reorganization. Accordingly, the Debtors are seeking interim approval to access $55 million of the DIP Facility to (i) repay the GE Credit Agreement Obligations, (ii) cash collateralize the Prepetition Letters of Credit, and (iii) meet their working capital needs, including,

without limitation, making payments to employees, suppliers, and various governmental taxing and licensing authorities.

55.     I believe that, on balance, the postpetition financing arrangement is the best financing option available to the Debtors under the present circumstances.  The Debtors and the DIP Lenders negotiated the DIP Facility in good faith and at arm's-length, and the Debtors' entry into the DIP Note Purchase Agreement is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest.

**E.     Motion of the Debtors for an Order (A) Authorizing the Continuation of the Existing Cash Management System, (B) Authorizing the Maintenance of Existing Bank Accounts and Business Forms, and (C) Authorizing the Maintenance of Existing Deposit Practices**

56.     Through this motion, the Debtors seek entry of an order authorizing the continued use of their existing cash management system, and authorizing the continued use of their existing bank accounts and business forms.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationery.  The Debtors further request the entry of an Order authorizing continued use of their prepetition deposit practices.

57.     The Debtors maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System").  In order to lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in

these chapter 11 proceedings, it is vital to the Debtors that they maintain their system of managing cash.

58.    Cash flow from the Debtors' United States operations ("Constar U.S.") is channeled from its Wells Fargo lockbox into a General Electric account, creating availability under the GE Credit Agreement, and providing funds for disbursements. Funds are transferred for disbursement from the General Electric Capital Corporation account into a Mellon account and/or into a Wachovia account for payroll. Constar Holland and Constar U.K. (collectively, the "Constar Foreign Subs") utilize cash management systems separate from the U.S. operations. Constar U.K. maintains three bank accounts at NatWest, one each for the type of currency used (Pound Sterling, U.S. Dollar, and Euro). Constar U.K. maintains a thirteen-week forecast for itself and the other Constar Foreign Subs to evaluate short term cash needs. All excess funds from the Constar Foreign Subs are wired to a General Electric account based on this forecast periodically through the month. In the event that funds held by Constar U.K. or in the accounts of the other Constar Foreign Subs is insufficient to meet their cash needs, Constar U.S. returns the necessary funds to Constar U.K. (which, if necessary, then transfers such funds on to the other Constar Foreign Subs). No excess cash is held by Constar U.K., and the Constar Foreign Subs keep meticulous records of intercompany loan balances between and among the various Constar entities.

59.    Constar U.S. payroll is made on a weekly basis out of Constar's Wachovia bank account for hourly wage employees and bimonthly for salaried employees (generally on the 15th and the 30th of each month). Constar U.S. deposits paychecks directly into their employees' bank accounts or in the event that an employee does not

have a bank account, the Debtors pay by live check. Constar U.K. employees, both salaried and hourly, are paid monthly through electronic transfer directly into each employee's bank account. Constar U.K. internally handles payments to its hourly employees and employs a payroll service to deposit paychecks for its salaried employees.

60.     The Debtors maintain current and accurate accounting records of these daily cash transactions, and submit that maintenance of this Cash Management System will prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of the estates.

61.     The Debtors seek authority to continue utilizing their current Cash Management System, as described above. The Debtors must be able to consolidate management of cash and centrally coordinate transfers of funds as they seek to emerge quickly from chapter 11. Substantial disruption to the Debtors' current cash management procedures would impair the Debtors' ability to successfully prosecute these pre-arranged chapter 11 cases and maximize the value of their estates.

62.     The Cash Management System utilizes certain bank accounts to collect, transfer, and disburse funds effectively and efficiently as needed. The Cash Management System provides daily visibility into Constar's bank accounts which provides significant benefits to the Debtors, including the ability: (a) to track closely, and thus control, all corporate funds, (b) ensure cash availability, and (c) reduce interest and administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Indeed, a disruption in the Cash Management System could cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their reorganization.

63.     The Cash Management System allows the Debtors to centrally manage all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as their creditors and this Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will continue to maintain detailed records reflecting all transfers of funds.

64.     Therefore, it is both essential and in the best interests of the Debtors' respective estates and creditors that the Cash Management System be maintained. Furthermore, the Debtors' pre-arranged chapter 11 cases will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the Cash Management System.  Accordingly, the Debtors respectfully request that the Court authorize the continued use of the Cash Management System.

65.     The Debtors also request that no bank participating in the Cash Management System (the "Cash Management Banks") that honors a prepetition check or other item drawn on any account that is the subject of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored post-petition.  The Debtors believe that such flexibility accorded the Cash Management Banks is necessary in order to induce the Cash Management Banks to continue providing cash management services without additional credit exposure.

66.     The Debtors seek a waiver of the U.S. Trustee requirement that their Bank Accounts be closed and that new postpetition bank accounts be opened.  If enforced in these cases (*especially given the expedited, pre-arranged nature of these cases*), such requirements would cause enormous disruption in the Debtors' businesses and would impair the Debtors' chapter 11 efforts.  As described in detail above, the Debtors' Bank Accounts comprise an established cash management system that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course of their business.  Therefore, to avoid delays in paying debts incurred post-petition, and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.  Otherwise, transferring the Bank Accounts will be disruptive, time consuming and expensive.

67.     The Debtors also request that they be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices) and checks existing immediately before the Petition Date without reference to the Debtors' status as debtors in possession.  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the size and publicity surrounding the cases.  Indeed, the Debtors' equity is publicly traded and the Debtors are subject to reporting requirements.  Without question, those creditors, suppliers, and customers that deal with the Debtors – both nationally and internationally – have been aware that the Debtors are financially distressed and will know of their chapter 11 filings.

68.     If the Debtors were required to change their correspondence, business forms and checks, they would be forced to choose standard forms rather than the current forms with which those that do business with the Debtors are familiar.  Such a change in operations would create a sense of disruption and potential confusion within the Debtors' organization, as well as with customers and suppliers.  The Debtors believe that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationery, business forms and checks.  The Debtors respectfully submit that to do so would be unnecessary and that appropriate care can be taken to assure the proper use of the existing forms.

69.     At all times, Constar U.S. maintains excess cash of less than $250,000 in the aggregate in its Bank Accounts.  Accordingly, such Bank Accounts are protected by the FDIC.  To the extent the Debtors have any excess cash, they request authority to invest excess funds in accordance with their prepetition practices described above.

70.     In the event that the Debtors have excess cash of greater than $250,000, they may consider investing such excess cash but only in compliance with the requirements of section 345(b) of the Bankruptcy Code.[4]

> **F.     Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Establishing Notification Procedures and Approving Restrictions of Certain Transfers of Interests in the Debtors' Estates**

71.     By this motion, the Debtors seek to enforce the automatic stay by implementing court-ordered procedures (the "Procedures") intended to protect the Debtors' estates against the possible loss of valuable tax benefits that could flow from

---

[4] To the extent the Debtors receive funds either under the DIP Facility or the Cash Collateral Stipulation, those funds will be invested in accordance with section 345(b) of the Bankruptcy Code.

inadvertent stay violations.  Pursuant to sections 105(a) and 362 of the Bankruptcy Code, the Debtors request authorization (i) to establish and implement restrictions and notification requirements regarding Tax Ownership and certain transfers of common stock of Constar (the "Stock"), and (ii) to notify holders of Stock of the restrictions, notification requirements and procedures.  The Debtors also seek approval of the form of notice, which will notify holders of Stock whose actions could adversely affect the Debtors' tax assets that the Procedures have been established by order of this Court.

72.     Constar and its domestic corporate subsidiaries file a consolidated U.S. income tax return.  The Debtors estimate that, as of November 29, 2010, Constar had a consolidated net operating loss ("NOL") carryforward for U.S. federal income tax purposes of at least $25.8 million and that such NOLs will increase by approximately $38.0 million dollars through the end of 2010.  Because the Internal Revenue Code (as amended, the "I.R.C.") permits corporations to carry forward NOLs to offset future income, the Debtors' consolidated NOL carryforwards are valuable assets of their estates. See I.R.C. § 172.  Based on a federal corporate income tax rate of 35%, the Debtors' NOL carryforwards could yield future tax savings to the Debtors in excess of $20 million.  The availability of these tax savings may prove crucial to the financial health of the reorganized Debtors.

73.     For the reasons discussed below, and consistent with the automatic stay, the Debtors need the ability to enforce the stay to preclude certain transfers and to monitor and possibly object to other changes in the ownership of Stock.  Specifically, trading of Stock could adversely affect the Debtors' future ability to utilize their NOL carryforwards and other tax attributes described above if too many 5% or greater blocks

of equity securities are created through purchases, sales or issuances, or too many shares are added to or sold from such blocks, such that, together with the previous trading by 5% shareholders during the preceding three year period, a section 382 ownership change (defined below) is triggered prior to the consummation of a confirmed chapter 11 plan.

74.     The use of NOL carryforwards is subject to certain statutory limitations. One limitation is contained in section 382 of the I.R.C. ("section 382"), which, in the case of a corporation that undergoes a change of ownership, limits that corporation's ability to use its NOL carryforwards and certain other tax attributes to offset future income. For purposes of section 382, a change of ownership occurs when the percentage of a company's equity held by one or more 5-percent shareholders (as defined in section 382 and the Treasury regulations promulgated thereunder) increases by more than fifty percentage points over the lowest percentage of stock owned by those shareholders at any time during a three-year rolling period. For example, if a 10% shareholder purchased additional stock and became a 61% shareholder, the percentage of stock owned by 5% shareholders would have increased by 51 percentage points, thereby causing an "ownership change."[5] See also I.R.C. § 383 (extending section 382 to tax credits and capital losses).

75.     In the event a corporation experiences a section 382 ownership change, section 382 generally imposes a limitation on the amount of NOLs and certain other tax attributes that can be utilized in each subsequent year to offset income. Subject to certain adjustments, this limitation is generally equal to the product of (1) the equity value of the debtor immediately before the change in ownership multiplied by (2) the long-term tax-

---

[5] For purposes of section 382, a sale of shares owned by a 5% shareholder is treated as creating a new 5% shareholder, even if none of the buyers of the shares individually acquires a 5% block of shares. See Treas. Reg. § 1.382-2T(j)(3)(i).

exempt rate prescribed by the Internal Revenue Service (3.54 % for the month of November 2010). If Constar were to undergo an ownership change at a time prior to consummation of a chapter 11 plan, the resulting annual limitation could result in a substantial portion of its NOL carryforwards and other tax attributes expiring unutilized.

76.     The proposed procedures and restrictions are necessary to protect the Debtors' NOL carryforwards, which are valuable assets of the Debtors' estates, while providing appropriate latitude for trading in Stock below specified levels. The Debtors' ability to meet the requirements of the tax laws to protect their NOL carryforwards may be seriously jeopardized unless procedures are established to ensure that certain trading in Stock is either precluded or closely monitored and made subject to Court approval. However, the Debtors recognize that the trading in Stock below specified levels (with contemporaneous notice of the transfers) does not, at this time, pose a serious risk to the NOL and tax credit carryforwards.

77.     The relief requested herein is tailored as narrowly as is reasonable to permit certain Stock trading to continue, subject only to Rule 3001(e) of the Federal Rules of Bankruptcy Procedure and applicable securities, corporate and other laws. The proposed restrictions on trading are crucial because once an interest is transferred, the transaction arguably might not be reversible for tax purposes, though it should be null and void under section 362 of the Bankruptcy Code. The relief requested is, therefore, critical to prevent what may be an irrevocable loss of the Debtors' NOL and tax credit carryforwards.

G.    **Motion of the Debtors for an Order Authorizing Debtors to Operate Their Businesses and Implementing the Automatic Stay**

78.    By this motion, the Debtors request, among other things, authority to operate their businesses under the worldwide protection of the automatic stay. The Debtors respectfully request that this Court enter an Order, pursuant to section 105(a) of the Bankruptcy Code, that will serve to notify all entities (domestic and foreign) with whom the Debtors do business or maintain relationships with that: (a) in the course of their business operations, the Debtors are authorized to continue operating their global businesses and manage their properties; (b) in the course of those operations, the Debtors have the power to enter into all transactions (including obtaining services, supplies and inventory) that they could have entered into in the ordinary course their businesses had there been no bankruptcy filing; and (c) suppliers and other parties may continue to engage in transactions with the Debtors in the ordinary course of business in the same manner and upon the same terms and conditions as they did before the filing of the Debtors' bankruptcy cases. Thus, this motion seeks to confirm the Debtors' authority to continue all aspects of their business operations, as well as to impose an automatic stay as a matter of protection against any actions or processes that might interfere with the Debtors' worldwide property, business, operations, contracts, customer relationships or assets from and after the Petition Date.

**H. Motion of the Debtors for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order (I) Authorizing Payment of Wages, Compensation, and Employee Benefits, and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations**

79.     Through this motion, the Debtors seek: (i) authority to pay, in their sole discretion, all obligations incurred under or related to the Employee Obligations and all costs incident to the foregoing, (ii) authority to maintain and continue to honor Employee Benefits as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course, and (iii) authorization for the Banks to receive, honor, process, and pay any and all checks drawn on the Disbursement Accounts and automatic payroll transfers, to the extent that such checks or transfers relate to any of the foregoing.

80.     In the ordinary course of business, the Debtors incur payroll and various other obligations and provide other benefits to their employees for the performance of services. The Debtors currently employ approximately 850 people, of which the majority are full-time employees, 2 are part-time employees, and 9 are on leave of absence (collectively, and as such employees may change from time to time, the "Employees").[6]

81.     The Debtors have costs and obligations in respect of the Employees relating to the period prior to the Petition Date. Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable in the ordinary course of business after the Petition Date.

82.     Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages, salary, and compensation for their

---

[6] From time to time, the Debtors also employ temporary workers.

Employees and directors (the "Wage Obligations") on a weekly (for hourly U.S. employees), twice monthly (for other U.S. employees), monthly (for U.K. employees), or quarterly (for directors) basis through direct deposits into Employees' and directors' accounts or by check. For most Employees and for the Debtors' directors, the payments are made to (or as directed by) the relevant Employee or director. For Employees who are temporary workers, the payments are typically made to the temporary employment agency on a variety of terms (and such agency then pays the temporary Employee). The Debtors' current estimated monthly gross payroll for their Employees is approximately $5 million and the Debtors' current estimated gross monthly directors' fees is approximately $34,000.

83. On January 10, 2011, Debtors funded payroll for their hourly U.S. Employees for the period ending on January 8, 2011. As of the Petition Date, approximately $200,000 in prepetition wages for hourly U.S. Employees is estimated to be accrued and unpaid.[7] On January 7, 2011, Debtors funded payroll for their salaried U.S. Employees for the period ending on January 15, 2011. The Debtors have paid outstanding directors' fees and expenses for the period ending on December 31, 2010. As of January 10, 2011, approximately, $12,000 in prepetition directors' fees and expenses is estimated to be accrued and unpaid.[8] On December 23, 2010, the Debtors funded payroll for their U.K. Employees for the period ending on December 31, 2010.

---

[7] To the extent that any Wage Obligations for hourly U.S. Employees for the prepetition period have not been paid as of the Petition Date, such unpaid amounts are less than $11,725 per individual.

[8] To the extent that any directors' fees and expenses for the prepetition period have not been paid as of the Petition Date, such unpaid amounts are less than $11,725 per individual.

As of the Petition Date, approximately $232,100[9] in prepetition wages for U.K. Employees is estimated to be accrued and unpaid.[10]

84.     The Debtors are required by law to withhold certain amounts from the Wage Obligations (the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  These withholding amounts relate to, for Debtors' U.S. Employees, federal, state, and local income taxes, as well as social security and Medicare taxes, and for their U.K. Employees, national insurance and other social welfare benefits under the National Insurance/Paye program.  Debtors may also be required to withhold amounts from the Wage Obligations for such items as court ordered child support payments, other attachments to wages, and government mandated savings plans.  In addition, the Debtors are required to make contributions of their own funds to the Taxing Authorities.  Debtors are required to make matching payments for their U.S. Employees on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance, and to make contributions for their U.K. Employees under the National Insurance/Paye program (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").  Some of the Payroll Taxes are for "trust fund" taxes that the Debtors have collected and hold in trust for the benefit of the Taxing Authorities.  Therefore, such funds do not constitute "property of the estate" and could not otherwise be used by the estates.  As of January 5, 2011, the

---

[9] All amounts in GBP have been converted to US Dollars using the conversion rate of 1.5473 (USD per GBP) as published in the Wall Street Journal on January 4, 2011.

[10] To the extent that any Wage Obligations for U.K. Employees for the prepetition period have not been paid as of the Petition Date, such unpaid amounts are less than $11,725 per individual.

Debtors owed the U.K. Taxing Authorities approximately $248,000 on account of Payroll Taxes relating to the prepetition period.

85.    In order to facilitate payment of the Wage Obligations, the Debtors engage companies that provide payroll services.  The Debtors process their own payroll, and engage Ceridian Corporation ("Ceridian") to submit their Payroll Taxes for all U.S. Employees and engage Moorepay Limited ("Moorepay") to process payroll for their salaried U.K. Employees.  The Debtors pay an average of $2,500 per month to Ceridian and an average of $400[11] per month to Moorepay in fees for these services (the "Payroll Service Fees").  Payment of these modest fees is crucial for the Debtors' seamless entry into chapter 11 and to ensure that all Employees are paid timely and accurately postpetition. As of January 10, 2011, approximately $2,900 in prepetition Payroll Service Fees is estimated to be accrued and unpaid.

86.    The Debtors' Employees and members of the Debtors' board of directors incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses. Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' business, the Employees and directors are reimbursed in full (the "Expense Reimbursements") after submission of appropriate documentation to the Debtors' accounting department.[12]  Expenses are reimbursed on a rolling basis, with a

---

[11] All amounts in GBP have been converted to US Dollars using the conversion rate of 1.5473 (USD per GBP) as published in the Wall Street Journal on January 4, 2011.

[12] For purposes of this Motion, the authorization to pay Expense Reimbursements is expressly intended to include payments to American Express Travel Related Services, Inc. and its affiliates ("American Express") in connection with its American Express Corporate Card Program, which is used by many U.S. Employees for business-related travel, hotel accommodations and meals, and to the NatWest Bank Visa account, in connection with the corporate card which is used for travel expenses for U.K. Employees in certain circumstances.  These corporate card programs are an important part of the Debtors' program for Expense Reimbursements and the Employees' loss or disruption of the ability to use the corporate cards for business expenses would impose a serious hardship on the Debtors and their Employees.

general lag time of approximately two weeks between submission and reimbursement. Over the past 12 months, the Expense Reimbursements have averaged approximately $153,000 per month.

87. Although it is difficult for the Debtors to determine the amount of Expense Reimbursements outstanding at any particular time, based upon the outstanding expenses currently known to Debtors and historical figures, the Debtors estimate that there may be as much as $263,000 of Expense Reimbursements outstanding as of January 10, 2011.

88. In the ordinary course of business, the Debtors have established various benefit plans and policies for their Employees which can be divided into the following categories: (i) medical insurance, dental insurance, and vision care; basic life and accidental death and dismemberment insurance; short-term disability benefits, and long term disability benefits, (collectively, the "Health and Welfare Plans"); (ii) paid-time-off plans, including vacation and sick days (collectively, the "PTO Plans"), (iii) a 401(k) plan (the "401(k) Plan"), (iv) pension plans (the "Pension Plans"), (v) car and fuel benefits (the "Car and Fuel Benefits"), and (vi) temporary housing benefits (the "Temporary Housing Benefits") (together with the Health and Welfare Plans, the PTO Plans, the 401(k) Plan, the Pension Plans, and the Car and Fuel Benefits, the "Employee Benefits"). The Debtors deduct specified amounts from the Employees' wages in connection with certain of the Employee Benefits, such as medical insurance and contributions to savings plans.

89. The Debtors sponsor several Health and Welfare Plans to provide benefits to Employees and retirees, including, without limitation, (i) medical insurance, dental

insurance, and vision care, (ii) basic life and accidental death and dismemberment insurance, (iii) short-term disability benefits, and (iv) long-term disability benefits.

90.     Debtors offer Health and Welfare Plans to all their full-time U.S. Employees and retirees. Neither temporary nor part-time U.S. Employees are eligible for the Health and Welfare Plans.  The Health and Welfare Plans for U.S. Employees and retirees are administered by six different vendors:  Independence Administrators ("Independence"), Metropolitan Life Insurance Company ("Met Life"), CIGNA Group Insurance ("CIGNA"), CVS Caremark ("Caremark"), United Concordia and UNUM.  In 2010, the Debtors paid approximately $8.8 million to provide the Health and Welfare Plans to their U.S. Employees and retirees, offset by $1.7 million in Employee payroll contributions.

91.     The Debtors' basic healthcare package for their U.S. Employees and retirees (the "Basic Healthcare Package") is provided primarily through a self-insured medical plan administered by Independence (the "U.S Medical Plan").  Through Independence, Debtors offer a preferred provider organization plan (a "PPO") to their U.S. Employees and retirees.  Debtors pay Independence approximately $750,000 per month for the Medical Plan; however, because Debtors self-insure, this amount varies based on claims experience.  Debtors estimate that as of January 10, 2011, there was approximately $1.2 million[13] in unpaid prepetition claims under the U.S. Medical Plan.

92.     Within the Basic Healthcare Package, the Debtors' prescription drug coverage is primarily provided to U.S. employees and retirees through a self-insured plan administered by Caremark (the "Prescription Drug Plan").  Through Caremark, the

---

[13] The amount includes approximately $400,000 for unpaid Independence invoices for prepetition Employee claims and an estimated $800,000 for claims accrued by Employees prepetition but not yet reported to or invoiced by Independence.

Debtors offer prescription drug coverage to the U.S. Employees and retirees as part of the Medical Plan.  The Debtors pay Caremark approximately $110,000 per month for the Prescription Drug Plan; however, because the Debtors self-insure, this amount varies based on claims experience.  As of January 10, 2011, the Debtors owed Caremark approximately $110,000 in unpaid prepetition amounts on account of the Prescription Drug Plan.

93.     Within the Basic Healthcare Package, the Debtors' dental coverage is primarily provided to U.S. employees and retirees through a self-insured plan administered by United Concordia (the "Dental Plan").  Through United Concordia, the Debtors offer dental coverage to U.S. Employees and retirees as part of the Medical Plan.  The Debtors pay United Concordia approximately $36,000 per month for the Dental Plan; however, because the Debtors self-insure, this amount varies based on claims experience.  As of January 10, 2011, the Debtors owed United Concordia approximately $8,000 in unpaid prepetition amounts on account of the Dental Plan.

94.     Debtors provide two health benefit programs for its U.K. Employees.  The Leeds Hospital Fund is an employee funded plan for medical and dental services offered to all U.K. Employees.  The company deducts payments from Employee wages and pays them to the Fund, but makes no contributions of its own to the Fund.  Under this program, Debtors collect approximately $1,500 per month to be transferred to the Fund.  As of January 5, 2011, Debtors had obligations outstanding to the Fund of approximately $1,600.  For U.K. salaried Employees, Debtors provide private health care insurance through Groupama, a provider of private health care insurance in the United Kingdom.

Debtors pay an annual premium of approximately $52,600 to Groupama, which payment is current for the prepetition period.

95.     The Debtors provide life insurance and accident and disability insurance to U.S. Employees through its basic life and accidental death and dismemberment package, which is primarily provided through Met Life (the "Life and AD&D Plan"). Through Met Life, Debtors offer certain life and AD&D insurance options to the U.S. Employees. Debtors pay Met Life approximately $38,300 per month for the Life and AD&D Plan. As of January 10, 2011, the Debtors owed Met Life approximately $37,000 in unpaid prepetition amounts on account of the Life and AD&D Plan. For their U.K. Employees, Debtors provide life insurance through a program that is administered by Willis under a policy issued by Canada Life. Debtors pay Canada Life an annual premium for the life insurance program of approximately $34,000. As of January 5, 2010, the Debtors owed approximately $39,000 for prepetition payments on the premium under this policy. Debtors also provide Personal Accident and Travel Insurance for their U.K. Employees through a policy issued by Chubb, and payments under this program are current as of the Petition Date.

96.     The Debtors provide short-term disability benefits to their Employees. For the U.S. Employees, this benefit is primarily provided through a self-insured disability plan administered by CIGNA (the "Short-Term Disability Plan"). Debtors pay CIGNA approximately $1,400 per month for the Short-Term Disability Plan in addition to approximately $19,000 per month paid directly to disabled employees; however, this amount varies based on claims experience. The Debtors estimate that as January 10, 2011 approximately $1,400 in prepetition obligations with respect to the Short-Term

Disability Plan were unpaid. The Debtors' short-term disability benefits for their U.K. Employees is fully self-funded by the Debtors, and payments under this program are current as of the Petition Date.

97. Debtors also provide long-term disability benefits to their Employees. Debtors long-term disability benefits for their U.S. Employees are primarily provided through CIGNA (the "Long-Term Disability Plan"). Through CIGNA, Debtors offer certain long-term disability insurance options to its U.S. Employees. Debtors pay CIGNA approximately $5,000 per month for the Long-Term Disability Plan. Debtors estimate that as of January 10, 2011 approximately $4,800 in prepetition obligations with respect to the Long-Term Disability Plan were unpaid. Debtors' long-term disability benefits for their U.K. Employees are fully self-funded by Debtors, and payments under this program are current as of the Petition Date.

98. Under the PTO Plans, Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation, sick/emergency days, personal days, and holidays. Eligible U.S. Employees accrue paid time off and related benefits on a vesting schedule based on years of service. Eligible U.K. Employees receive approximately 29 days of vacation per year. The Debtors also administer other paid time off programs for holidays, bereavement, jury duty, and school activities. As of the end of November 2010, the Debtors owe some holiday pay accrual to Employees.

99. Because the PTO Plans are essential features of the Debtors' employment benefits and failure to provide these benefits could harm employee morale and encourage the premature departure of Employees, the Debtors request authority to honor all of their obligations under the PTO Plans as and when they come due.

100.    For their U.S. Employees, Debtors sponsor a 401(k) retirement investment plan and withhold from the wages of participating Employees contributions towards the 401(k) Plan (the "Withholding Contributions"). Wells Fargo Bank, N.A. ("Wells Fargo") administers the 401(k) Plan.  All of Wells Fargo's fees are covered by revenue sharing agreements with the fund companies that operate the investment funds that hold the investments of the 401(k) Plan.  Plan Participants pay the expense ratio for each investment fund.  The Debtors do not provide any matching contributions.

101.    As January 10, 2011, all of the Employees' payroll contributions that have been deducted have been transferred to the 401(k) Plan.  These are monies of the Employees and not monies of the Debtors.

102.    For their U.K. Employees, Debtors sponsor a defined contribution scheme (the "Contribution Scheme") and withhold from the wages of participating Employees contributions towards the Contribution Scheme.  Legal & General Group plc ("Legal & General") administers the Contribution Scheme.  The Debtors make monthly matching contributions of approximately $10,800 to the Contribution Scheme.

103.    As of the Petition Date, all of the U.K. Employees' payroll contributions that have been deducted have been transferred to the Contribution Scheme.  These are monies of the U.K. Employees and not monies of the Debtors.  As of January 5, 2011, there were approximately $39,000 in unpaid Employer contributions for the prepetition period in connection with the Contribution Scheme.

104.    The Debtors sponsor a Pension Plan for a certain group of grandfathered active U.S. Employees including approximately 125 salaried employees and 559 hourly employees as well as approximately 1,716 retirees in payment status and 2,401 retirees

with future benefits payable.  Debtors 2010 estimated yearly contribution to the Pension Plan is approximately $2.9 million.  As of the Petition Date, the Debtors believe that all prepetition obligations under the Pension Plan have been paid.

105.    The Debtors sponsor a defined benefit pension scheme (the "Pension Scheme") for a certain group of grandfathered salaried U.K. Employees pursuant to which both the salaried Employees and the company make contributions to a pension fund.  The scheme is administered by KPMG and the fund run by independent Trustees. The average monthly contribution to the pension scheme is $42,000.[14]  As of January 5, 2011, there were approximately $7,740 in unpaid obligations with respect to prepetition contributions under the Pension Scheme.  In connection with the U.K. Pension Schemes, the Debtors are also required to make payments to the Pension Protection Fund, a statutory body covering Pension Scheme insurance.  As of the Petition Date, the Debtors believe that all prepetition obligations to the Pension Protection Fund for 2010 and 2011 have been paid.

106.    The Debtors provide 12 U.S. Employees with a company car and 31 U.S. Employees with a car allowance in lieu of a company car, which allowance is paid to these Employees as part of their compensation.  In connection with this program, the Debtors pay approximately $4,000 to lease company cars and $18,000 of car allowance per month.  All car allowances under this program were paid to Employees when the Debtors funded payroll for the period ending on January 15, 2011, as discussed above.

---

[14] Debtors also offer a "Stakeholder Pension Scheme" to its hourly U.K. employees.  Under this scheme, the hourly U.K. Employees have the option of having money deducted from their wages and paid to a pension plan nominated by the Employee, but the company makes no contribution to the plan.  There are currently no participants in this scheme.

107.     As is customary in the United Kingdom, the Debtors provide certain of its U.K. Employees with a company car and with accompanying allowances for fuel.  In connection with this program, Debtors incur monthly charges of approximately $10,800.  As of January 5, 2011, approximately $15,500 for amounts owed to vendors for lease and fuel payments for company cars have accrued but remain unpaid.

108.     The Debtors pay monthly rent and other expenses in connection with Temporary Housing Benefits provided to 1 Employee.  In connection with this program, Debtors incur monthly charges of approximately $3,300.  As of January 10, 2011, approximately $1,100 for amounts owed in connection with Temporary Housing Benefits have accrued but remain unpaid.

109.     The Debtors believe that the aggregate amount of the Employee Obligations, including, but not limited to, the Wage Obligations, Expense Reimbursements, Payroll Taxes, Employee Benefits and all costs incident to the foregoing does not exceed $2.5 million.[15]

110.     I believe that the commencement of these chapter 11 cases will likely cause uncertainty and concern among the Debtors' employees.  Nonpayment of compensation and benefits, in addition to imposing hardship on the employees, would likely also generate doubts regarding the stability of the Debtors and their prospects for reorganization.  Failure to pay the employee obligations would undermine morale, create significant risk of attrition and cause immediate and irreparable harm.  The relief requested in this motion will greatly assist the Debtors in alleviating these concerns and

---

[15] This figure does not include the Debtors' obligations under the PTO Plans, as these obligations are not cash pay obligations of the Debtors as of the Petition Date.  This figure also does not include any amounts for payments that have been initiated by Debtors but for which the transactions have not cleared Debtors' banks.

retaining their employees.  Finally, the aggregate amounts owing to an employee as of the

Petition Date falls under the administrative priority cap of $11,725 found in section

507(a)(4) of the Bankruptcy Code.

I.     **Motion of the Debtors for Entry of an Order Authorizing Them to (A) Continue Insurance Coverage Entered into Prepetition and (B) Enter into New Insurance Policies**

111.    Through this motion, the Debtors seek authority to:  (a) continue their

Insurance Policies, uninterrupted, by paying any prepetition premiums related to their

Insurance Policies to the extent that they determine in their discretion that such payment

is necessary or appropriate (the "Insurance Obligations"), and (b) enter into new

insurance policies through renewal of the Insurance Policies or purchase of new policies

in the ordinary course of their business.  The Debtors estimate and seek to pay, through

this motion, such outstanding Insurance Obligations, if any, and future insurance policies

and fees to renew and/or replace their Insurance Policies in 2011.

112.    In connection with the operation of the Debtors' business and the

management of their properties, the Debtors maintain numerous insurance programs

providing coverage for liabilities relating to, among other things, property, casualty,

workers' compensation, directors and officers liability and other insurance programs

(collectively, the "Insurance Programs").  In many cases, such insurance coverage is

required by the diverse regulations, laws and contracts that govern the Debtors'

commercial activities.  Further, the Guidelines of the Office of the United States Trustee

for the District of Delaware require debtors to maintain insurance coverage throughout

these chapter 11 cases.

113.    The Debtors maintain third-party Insurance Policies through different

insurance companies.  The Insurance Policies are essential to the ongoing operation of the

Debtors' business.  The total annual premiums for the Insurance Policies is approximately $1.7 million, excluding approximately $0.2 million in annual workers compensation deductible payments, approximately $0.2 million in annual broker fees, and approximately $0.6 million paid in 2010 for Management Liability run-off coverage.

114.    The Debtors do not believe that they need Court approval to maintain their existing policies.  Moreover, prior to the Petition Date, the Debtors were not in default for any payments due under the Insurance Policies.  Out of an abundance of caution, however, the Debtors, by this motion, seek entry of an order authorizing them to pay prepetition insurance premiums (if any such amounts are due) necessary to maintain insurance coverage in current effect and, in their sole discretion, revise, supplement or change insurance coverage as needed.

115.    The Insurance Policies can be grouped into four main categories.  The first category of Insurance Policies covers the Debtors' property (the "Property Policies"), and provides coverage through September 18, 2011.  The Property Policies provide coverage for losses relating to, among other things, loss or damage to property resulting from fire, flood, and weather damage.  Such insurance is required under various credit agreements for the benefit of the secured creditors.

116.    The second category of Insurance Policies covers casualty losses (the "Casualty Policies"), and provides coverage through November 21, 2011.  The Casualty Policies provide coverage for losses relating to, among other things, commercial general liability, automobile, workers' compensation, international liability, and excess umbrella coverage.  Although the third party insurer is primarily liable to the employees for workers' compensation claims under these policies, the Debtors are responsible for the

first $250,000 of any claims (per claim) made by U.S. employees only and are required to reimburse the insurer for all claims paid with respect to any particular claim up to such limit. The insurer holds a letter of credit in the amount of $1,250,000 to secure its interest against Constar's obligation to make such reimbursement. Certain of the Casualty Policies are required to be maintained pursuant to applicable law and to the terms of the Debtors' credit facilities and/or notes.

117. The third category of Insurance Policies covers management liability (the "Management Liability Policies") and provides coverage for liabilities relating to, among other things, directors and officers liability and fiduciary/fidelity. The Management Liability Policies provides coverage through the earlier to occur of (i) May 29, 2011 or (ii) consummation of a plan of reorganization with respect to directors and officers liability, and November 21, 2011 with respect to fiduciary/fidelity liability. Notwithstanding the expiration or termination of the Management Liability Policies as described in the preceding sentence, the existing directors and officers liability policies will provide "tail" coverage for six years for liabilities arising from events or actions occurring prior to the expiration or termination of the existing Management Liability Policies. Total premium cost for the directors and officers liability policies, which have effective dates from May 29, 2010 to May 29, 2011 was approximately $840,000 which includes the cost of run-off coverage.

118. The fourth category of Insurance Policies covers terrorism risk in the UK (the "Terrorism Policies") and provides coverage through November 21, 2011. The Terrorism Policies provide coverage for liabilities relating to, among other things, losses

arising from terrorism in the UK. Such insurance is required under various credit agreements for the benefit of the secured creditors.

119.    In addition, the Debtors self-insure with respect to U.S. operations for certain employee medical benefits. Debtors have arranged for stop-loss coverage with a third party insurer for claims in excess of $300,000. This stop-loss policy provides coverage through December 31, 2011.

120.    The Debtors are required to pay premiums under the Insurance Policies. As of the Petition Date, the Debtors estimate that $0 is outstanding in connection with insurance premiums for the above-mentioned Insurance Policies. Continuation of policies in all categories of insurance is essential to the ongoing operations of the Debtors' business. The Debtors intend to maintain appropriate levels of insurance at all times.

121.    The Debtors also carry several insurance-related bonds, the total annual cost of which is approximately $10,000. These include: (i) a $500,000 bond in favor of the State of Tennessee to securitize Constar's liability for pre-2003 self-insured workers compensation claims, (ii) a $110,000 bond in favor of the US Army Corps of Engineers to securitize Constar's performance obligation relating to wetlands adjacent to Constar's Havre de Grace MD plant, and (iii) a $5,000 bond in favor of Union Pacific Railroad to securitize Constar's performance obligation relating to a rail siding/spur at Constar's Jackson MS plant.

122.    The Debtors employ Willis Group ("Willis") as insurance brokers to assist them with the procurement and negotiation of their Insurance Programs for US operations and a Willis affiliate, (Willis Limited  collectively with Willis, the "Brokers"), for the

same purpose with respect to UK operations.  These Brokers provide services to and receive compensation (the "Brokers Fees") from the Debtors pursuant to certain contracts with the Debtors.  The Debtors pay an annual fee of approximately $155,000 ($38,750 per quarter) to the Brokers as Brokers Fees for such services.  As of the Petition Date, the Debtors believe that all Broker Fees have been paid for services rendered prior to the Petition Date.

123.    Payment of Insurance Obligations, and any other amount to the extent the Debtors determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits or proceeds provided under any of the Insurance Policies, in addition to imposing hardship, would likely also generate doubts regarding the stability of the Debtors and their prospects for reorganization.  If the Debtors do not honor their obligations under the Insurance Policies, certain of the Insurance Companies will refuse to continue doing business with the Debtors.  Under such a circumstance, the Debtors will be exposed to numerous risks resulting from a lapse in insurance coverage.

**J.      Motion of the Debtors for an Order Pursuant to Sections 105(a), 363(b), 1107 and 1108 of the Bankruptcy Code Authorizing, But Not Requiring, Payment of Prepetition Claims of Certain Vendors**

124.    By this motion, the Debtors seek authority to pay prepetition shipping and delivery charges (the "Prepetition Shipping Charges") to third party trucking, container forwarders and other shippers[16] (the "Shippers") and storage charges (the "Prepetition Warehouse Charges" and together with the Prepetition Shipping Charges, the

---

[16] Excludes third parties who provide services pursuant to a valid contract or do not have the right to assert possessory liens.

"Prepetition Shipping/Warehouse Claims") to terminal operators (the "Warehousemen"; and together with the Shippers, the "Vendors") to the extent that the Debtors determine, in the exercise of their business judgment, that payment of such Prepetition Claims is necessary and appropriate to preserve their businesses.

125.     The bottle manufacturing industry depends on reliable Shippers.  As is commonplace in the industry, the Debtors operate a "just-in-time" inventory system and typically do not store significant quantities of raw materials or finished goods to supply their business operations.  This system greatly reduces the Debtors' inventory storage costs and the amount of the Debtors' liquidity tied up in working capital on the production floor.  The Debtors' customers typically do not store inventory, and thus, rely heavily on timely supply of Debtor's product.  Shippers are vitally important to this process.

126.     At any given time, there are Shippers transporting raw materials and bottles from the Debtors' numerous production facilities and being held by various Warehousemen in storage terminals awaiting delivery.  If Shippers—none of whom have contracts with Constar—stopped shipping the Debtors goods, the Debtors' operations would quickly grind to a halt.  Product would not reach customers, who likely would immediately seek to terminate their contracts with Debtors in favor of alternative suppliers.[17]  The results could be disastrous.

127.     In addition, certain Shippers may not be familiar with the bankruptcy process and/or unwilling to continue to do business with the Debtors if their prepetition

---

[17] Importantly, in some cases, the Debtors' contracts with certain of these customers provide only a framework for the issuance of purchase orders that are limited in scope to particular projects or orders. Thus, the Debtors' postpetition ability to use the contracts to compel their customers to continue purchasing Debtors' goods may be limited.

claims are not paid, at least in part. As noted, if Shippers discontinue their supply of goods and services as a result of the Debtors' bankruptcy cases, the impact on the Debtors' operations would be severe. The Debtors' manufacturing process would be compromised and deliveries to customers would be halted. Thus, in order to maintain going concern value and allow the Debtors' reorganization to proceed, the Debtors request the authority, but not the obligation, to pay the Prepetition Shipping/Warehouse Claims (in full or in part) subject to the terms and conditions outlined below.

128.    The services provided by the Warehousemen are critical to the Debtors' day to day operations, as the Debtors depend upon these providers for timely, consistent storage of materials and products from their plants pending delivery to customers. In short, the storage of bottles by Warehousemen, pending distribution to the Debtors' customers, is essential to the Debtors' business operations.

129.    If the Prepetition Shipping/Warehouse Claims are not paid, many of the Vendors will likely refuse to perform additional services for the Debtors. In such event, the Debtors will incur significant additional expenses (such as premium shipping costs or storage fees) to replace the Vendors, which amounts will likely exceed the amount of unpaid Prepetition Shipping/Warehouse Claims that the Debtors request permission to pay hereunder. The Debtors' customers rely on the timely delivery. If shipments are not made promptly and regularly, the Debtors run the risk of frustrating the expectations of their customers and causing a loss of customer goodwill. Further, because of the filing of these chapter 11 Cases, certain Vendors who hold goods for delivery to or from the Debtors may refuse to release such goods pending payment for their services, thereby disrupting the Debtors' operations. The Vendors will likely assert, under applicable law,

possessory liens with respect to the Debtors' property in possession of such Vendors. Thus, the Debtors will have no alternative but to pay the Prepetition Shipping/Warehouse Claims in full in any event in order to affect the release of any the goods.

130.    The Debtors request the authority, but not the obligation, to pay the Prepetition Shipping/Warehouse Claims up to $1.35 million[18] in the aggregate as determined by the Debtors in their sole discretion and in the exercise of their reasonable business judgment, in order to continue receiving the vital services provided by the Vendors.  The Debtors propose to condition the payment of Prepetition Shipping/Warehouse Claims on the agreement of individual Vendors to supply goods and services to the Debtors on credit terms agreed to by the Debtors in their reasonable business judgment.

131.    I believe that the commencement of these chapter 11 cases will likely cause uncertainty and concern among the Debtors' Vendors.  Nonpayment of invoices, in addition to imposing hardship on the customers, would likely also generate doubts regarding the stability of the Debtors and their prospects for reorganization.  Failure to pay the Vendor obligations would undermine morale, create significant risk of attrition and cause immediate and irreparable harm.  The relief requested in this motion will greatly assist the Debtors in maintaining critical business relationships.

---

[18] The amount owed to at least one prepetition shipper includes both prepetition and postpetition amounts. The listed amount includes figures from Constar UK converted from GBP to USD using the exchange rate of 1.5473 quoted in the Wall Street Journal on January 4, 2011.

**K.** **Motion of the Debtors Pursuant to Sections 105(a) and 366 of the Bankruptcy Code for Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

132.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, gas, trash collection, water, telephone services and/or other similar services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Providers").

133.     Through this motion, the Debtors request, among other things, pursuant to sections 105(a) and 366 of the Bankruptcy Code, entry of the interim order and the final order (i) determining that the Utility Providers have been provided with adequate assurance of future payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving the Debtors' proposed offer of adequate assurance and procedures governing Utility Providers' requests for additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (iv) establishing procedures for the Utility Providers to seek to opt out of the Debtors' proposed adequate assurance procedures; and (v) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this motion.

134.     During the course of these proceedings, the Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner.  The Debtors have budgeted availability that is more than sufficient to pay all postpetition obligations for Utility Services.

135.     As adequate assurance of payment for postpetition services, the Debtors propose to provide, on or before the first day of each week, a deposit equal to one (1) week of expected Utility Service usage (calculated as the average weekly usage in the 6 months prior to the Petition Date) to each Utility Provider (the "Adequate Assurance Deposits").[19]

136.     Uninterrupted Utility Services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of the Debtors' chapter 11 cases. The Debtors own and/or maintain significant amounts of machinery, equipment, and other assets at a number of their owned and leased facilities.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed. It is therefore critical that Utility Services continue uninterrupted.

**L.     Motion of the Debtors for an Order Under Bankruptcy Code Sections 105(a), 363, 365, 506, 549, 553, 1107 and 1108 Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and to Continue Customer Programs**

137.     The Debtors provide certain rebate and incentive programs to their customers to induce and maintain the customers' loyalty.  Through this motion, the Debtors request, among other things, authority, in their discretion: (i) to perform their prepetition obligations related to the Customer Programs (as defined in the motion) with respect to certain known, regular recipients of the benefits of such programs (the "Regular Recipients"), as the Debtors deem advisable, subject to certain overall limits set forth in the motion; (ii) to perform their prepetition obligations related to Customer

---

[19] To the extent Debtors do not have sufficient invoices from a Utility Provider for the Utility Services to do such a calculation, the Debtors will estimate such amount in good faith.

Programs related to other customers (each, an "Other Customer") as the Debtors deem advisable, pursuant to the procedures set forth in the motion; and (iii) to continue, renew, replace, and/or terminate any of the Customer Programs, as they deem advisable, in the ordinary course of business, without further application to this Court. The prepetition claims of customers relating to the Customer Programs are referred to herein as "Customer Claims."

138.    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors sought to develop and sustain a positive reputation in the marketplace through the implementation of certain forms of sales and marketing rebates, including but not limited to (i) periodic sales rebates (the "Sales Rebate Program"), (ii) final price adjustment rebates (the "Price Adjustment Rebate Program"), (iii) periodic brokers' commissions (the "Commission Program"), and (iv) warranty and pricing adjustments (the "Warranty Program"; together with the Sales Rebate Program, the Price Adjustment Rebate Program, and the Commission Program, the "Customer Programs"), which rebates and allowances are calculated based upon various factors related to a customer's purchases.

139.    Under the Sales Rebate Program, certain customers accrue rebates based on a percentage of volume or revenue. The accrued rebates are then paid periodically, typically on a yearly basis, either at the end of calendar year or the end of the customer's fiscal year. Under the Price Adjustment Rebate Program, certain customers pay the Debtors based on a price per unit higher than the agreed contractual rate. Then, periodically, the Debtors rebate such customers the amount necessary to achieve the contractually agreed price. Under the Commission Program, brokers and others are paid

a commission, based on customer sales, on a periodic basis, typically quarterly. Under the Warranty Program, the Debtors, from time to time, issue certain customers credits in order to account for price adjustments in connection with a variety of issues, including those related to shipment of product, resin prices, and billing corrections.

140.     Each Customer Program is unique and is negotiated to fit the unique attributes of the particular customer and situation. Similar rebate and marketing programs are commonplace among the Debtors' competitors. The universal goals of the Customer Programs are to meet competitive pressures, maximize sales, ensure customer satisfaction, and generate brand loyalty and goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing net revenue.

141.     As of the Petition Date, the Debtors estimate they have outstanding obligations of approximately $4.71 million for the cost of Customer Programs.

142.     Many of the rebates and allowances that make up the Customer Programs, however, take the form of credits applied to a particular Customer's account. Moreover, many of the Debtors' liabilities under the Customer Programs will accrue postpetition, as such obligations are based upon annual sales and growth targets.

143.     The Debtors desire to continue, during the postpetition period, those Customer Programs that they believe are beneficial to their businesses and cost-effective. Thus, the Debtors seek this Court's authority to (a) honor an aggregate amount of $4.71 million (the "Regular Recipient Aggregate Limit") in the Debtors' sole right and

discretion to the Regular Recipients on account of their Customer Claims[20], and (b) to continue the Customer Programs pursuant to the Customer Practice Procedures as to Other Customers.

144.    The total operational and administrative cost to the Debtors to continue the Customer Programs is relatively insignificant in comparison to the revenue that such Customer Programs generate.  For the reasons set forth herein, the Debtors believe it is in the best interests of the Debtors and their estates to continue, in the ordinary course of their businesses, those of the Customer Programs, pursuant to paragraph 142, that the Debtors determine to be beneficial.

145.    The importance of the Debtors' major customers to their businesses cannot be overstated.  The preservation of the value of the Debtors' businesses is dependent upon the development and maintenance of customer loyalty and the preservation of the Debtors' customer base.  In turn, the Debtors' ability to maintain the loyalty of their existing customer base and to attract new customers hinges on the continuation of the Customer Programs, pursuant to the Customer Practices Procedures set forth herein.

146.    The commencement of  the Debtors' chapter 11 cases will no doubt create apprehension on the part of customers or potential customers regarding their willingness to commence or continue doing business with the Debtors.  The Debtors believe that without the requested relief, the stability of the Debtors' business will be significantly undermined, and otherwise loyal customers may explore alternative sources.  As

---

[20] The Debtors believe that the aggregate amount of Customer Claims owed to the Regular Recipients does not exceed the Regular Recipient Aggregate Limit.  If the Debtors discover that any customers who were not listed on Exhibit B to the motion have Customer Claims, and the payment of such Customer Claims would not exceed the Regular Recipient Aggregate Limit, the Debtors hereby request authority to pay such Customer Claims without the requirement that such customers file a Customer Demand or otherwise comply with the Customer Practice Procedures, and without further authorization from this Court.

described above, the damage that would result if the Debtors failed to honor their prepetition obligations with respect to Customer Programs significantly outweighs any detriment to the Debtors' creditors or their estates if such Customer Programs are honored.

147.    To preserve the value of their businesses, the Debtors must be permitted, in their sole discretion, to continue honoring or paying all prepetition Customer Program obligations without interruption or modification, pursuant to the provisions set forth above.

148.    The Debtors' customers are the life-blood of their businesses.  Any curtailment of the Debtors' ability to continue to provide the Customer Programs, pursuant to the provisions set forth above, and the resulting negative public perception, may enable the Debtors' competitors to take advantage of the Debtors' situation.  This, in turn, would cause substantial harm to the Debtors' business, their relationships with their customers, and ultimately the proposed reorganization of the Debtors.  Considering the relatively minimal expense of the relief requested herein as compared to the size of these chapter 11 cases and the critical importance of the Customer Programs to the Debtors' continued viability, entry of an order granting the relief requested herein is appropriate and, indeed, essential.

149.    In the event that the Customer Claims are not paid and the customers resort to asserting setoff rights or recoupment defenses, the Debtors would be required to expend time, expenses, and resources either responding to such customers' lift stay requests in order to assert setoff rights or otherwise challenging, to the extent appropriate, any invalid recoupment defense asserted by the customers.  The Debtors believe that they

would thereby incur added and unnecessary administrative expenses in addition to the ill will of their customers, both to the detriment of the Debtors' creditors and other parties in interest.

150.     In contrast, payment of valid Customer Obligations and maintenance of the Customer Programs as set forth herein, will (i) provide the Debtors with a means of efficiently processing the Customer Claims and (ii) reduce the administrative expenses the Debtors would otherwise face if compelled to challenge any customers' exercise of purported setoff rights or recoupment defenses.  In addition, as noted above, such payment will allow the Debtors to maintain positive relations with their customers as the Debtors pursue a reorganization.

151.     I believe that the commencement of these chapter 11 cases will likely cause uncertainty and concern among the Debtors' customers.  Termination of prepetition obligations and customer programs will, in addition to imposing hardship on the customers, would likely also generate doubts regarding the stability of the Debtors and their prospects for reorganization.  Failure to continue pay the prepetition obligations or to terminate customer programs would undermine morale and cause immediate and irreparable harm.  The relief requested in this motion will greatly assist the Debtors in maintaining customer relationships.

> **M.**     **Motion of the Debtors for an Order Pursuant to Sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy Code Authorizing Payment of Certain Prepetition Taxes and Regulatory Fees and Granting Related Relief**

152.     In connection with the normal operations of their business, the Debtors incur various Taxes and Fees (as defined in the motion), which the Debtors remit to the appropriate Taxing Authorities (as defined in the motion).  On average, the Debtors

estimate they incur approximately $687,386[21] in aggregate Taxes and Fees per month. According to the Debtors' books and records, approximately $2.7 million of prepetition Taxes and Fees are owed to the Taxing Authorities as of the Petition Date. Nevertheless, out of an abundance of caution, the Debtors hereby request the authority to pay up to $3 million in prepetition Taxes and Fees that may have accrued during the prepetition period and become due and owing. Any amounts that are actually due, but have not yet been paid to the Taxing Authorities because of these cases, represent a small fraction of the Debtors' total assets. Further, some, if not all, of the Taxing Authorities may cause the Debtors to be audited if the Taxes and Fees are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from their reorganization efforts. If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the stay or pursue other remedies that will harm the estates.

153.    In all cases, the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business. Any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.

---

[21] The amounts in this paragraph include figures from Constar UK converted from GBP to USD using the exchange rate of 1.5473 quoted in the Wall Street Journal on January 4, 2011.

### N. Motion of the Debtors for an Order Authorizing the Debtors to Employ and Compensate Certain Professionals in the Ordinary Course of Business

154.    By this motion, the Debtors request, among other things, authority to employ and compensate certain professionals utilized in the ordinary course of the Debtors' businesses.

155.    The Debtors retain the services of various accountants and attorneys in the ordinary course of their business operations (each an "Ordinary Course Professional" or "OCP" and, collectively, the "OCPs"). The OCPs provide services to the Debtors in a variety of small and discrete matters unrelated to the Debtors' Cases, including, but not limited to, general corporate, accounting, auditing, tax and litigation matters.

156.    The Debtors seek permission to continue to employ the OCPs postpetition without each OCP having to file a formal application for employment and compensation pursuant to sections 327, 328, 329, and 330 of the Bankruptcy Code.[22] Given the number and geographic diversity of the OCPs regularly retained by the Debtors, it would be unwieldy and burdensome both to the Debtors and to this Court to request that each OCP apply separately for approval of its employment and compensation. Additionally, the Debtors do not believe that section 327 of the Bankruptcy Code requires court approval, but, out of an abundance of caution, the Debtors request the relief sought herein.

157.    The Debtors request that they be permitted to employ and retain the OCPs, effective as of the Petition Date, on terms substantially similar to those in effect prior to the Petition Date, but subject to the terms described below. The Debtors represent that: (a) they wish to employ the OCPs as necessary for the day-to-day operations of the

---

[22] Provided that the fees for each such OCP, excluding costs and disbursements, do not exceed $60,000 per month on average over a rolling three-month period while these chapter 11 cases are pending. Any payments made in excess of this fee cap to any OCP shall be subject to prior approval of this Court.

Debtors' businesses; (b) expenses for the OCPs will be kept to a minimum; and (c) the OCPs will not perform substantial services relating to bankruptcy matters without permission of this Court.

158.    Although some of the OCPs may hold minor amounts of unsecured claims against the Debtors in respect of prepetition services rendered, the Debtors do not believe that any of the OCPs have an interest materially adverse to the Debtors, their creditors or other parties in interest. By this Motion, the Debtors are not requesting authority to pay prepetition amounts owed to OCPs.

159.    The Debtors submit that the continued employment and compensation of the OCPs is in the best interests of their estates, creditors, and other parties in interest. While some OCPs may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis. If the background knowledge, expertise and familiarity that the OCPs have with the Debtors and their operations are lost, the Debtors will undoubtedly incur additional and unnecessary expenses in getting replacement professionals "up to speed."  The Debtors' estates and their creditors are best served by avoiding any disruption in the professional services required in the day-to-day operation of their businesses.

**Additional Motions**

O.    **Motion of the Debtors for an Order Establishing Various Bar Dates for Filing Proofs of Claim and Approving Form, Manner and Sufficiency of Notice Thereof**

160.    Through this Motion, the Debtors request that the Court establish the General Bar Date 60 days after the Petition Date, and that the Debtors serve the Bar Dates Notice (such service date, the "Service Date") as soon as is practicable after, but no later than two (2) business days after the date on which the Debtors file their Schedules

and SOFAs.  The Debtors also request that the Court establish the following Bar Dates:
(a) a Governmental Bar Date of 180 days after the Petition Date; (b) a Schedules Bar
Date of the later of the General Bar Date or thirty (30) days after the date that notice of
the applicable amendment to the Schedules, if any, is served on the claimant; (c) an
Executory Contract Rejection Bar Date of the later of the General Bar Date or (b) thirty
days after the rejection of such Executory Contract; and (d) a 503(b)(9) bar date of 45
days after the Petition Date.

161.    The Debtors propose to serve on all known entities holding potential
prepetition and postpetition claims: (i) a notice of the Bar Dates (the "<u>Bar Dates Notice</u>");
(ii) a proof of claim form based upon Official Form No. 10 (the "<u>Proof of Claim Form</u>");
and (iii) the Section 503(b)(9) Claim Request form (collectively, the "<u>Bar Dates Notice
Package</u>").  The Debtors anticipate that they will serve, upon all known Entities holding
potential prepetition or postpetition Claims, the Bar Dates Notice Package no later than
five (5) business days after the entry of the Bar Dates Order.

162.    The Proof of Claim Form mailed to potential claimants will state, along
with the claimant's name, whether the entity's claim is listed in the Schedules and, if so,
(i) whether the claim is listed as disputed, contingent or unliquidated, and (ii) whether the
entity's claim is listed as secured, unsecured or priority.  If a claim is listed in the
Schedules in a liquidated amount that is not disputed or contingent, the dollar amount of
the Claim (as listed in the Schedules) will also be identified on the Proof of Claim Form.
Any entity that relies on the information in the Schedules will bear responsibility for
determining that its claim is accurately listed therein.

163.     All Section 503(b)(9) Claimants seeking payment of Section 503(b)(9) Claims from the Debtors will be required to submit a Section 503(b)(9) Claim Request. The Debtors request that all Section 503(b)(9) Claimants be required to set forth in their Section 503(b)(9) Claim Request with specificity: (i) the amount of the Section 503(b)(9) Claim; (ii) the particular Debtor against which the Section 503(b)(9) Claim is asserted; and (iii) the precise value of the goods the Section 503(b)(9) Claimant contends the Debtor received within twenty (20) days before the Petition Date.  The Debtors further request that the Court require the Section 503(b)(9) Claim Request to include or attach documentation identifying the particular invoices for which any such Section 503(b)(9) Claim is being asserted.  Finally, any Section 503(b)(9) Claim Request must include a certification that the goods with respect to which the Section 503(b)(9) Claim is being filed were sold in the ordinary course of business.

164.     In addition to those parties listed on the Debtors' Schedules or having filed a notice of appearance in these chapter 11 cases, the Debtors believe that potential claims against the Debtors may exist that the Debtors are unaware of or unable to identify. Accordingly, the Debtors believe that it is necessary to provide notice of the General Bar Date to entities whose identities, names and addresses are unknown to the Debtors. Therefore, pursuant to Bankruptcy Rule 2002(l),  the Debtors request authority to publish notice of the General Bar Date, in The New York Times (National edition) and The Financial Times (European edition), and such other local publications as the Debtors deem appropriate, no less than 20 days prior to the General Bar Date.

165.     The circumstances of these chapter 11 cases justify setting these Bar Dates.  The Debtors are seeking to move expeditiously through the bankruptcy process

and intend filing a plan of reorganization and disclosure statement on or about the Petition Date. In connection with the plan process (especially given the nature of these pre-arranged cases), the Debtors must ascertain the amount and the extent of all claims asserted against the Debtors' estates. The Debtors respectfully submit that establishing the General Bar Date 60 days after the Petition Date as the General Bar Date will provide potential claimants ample time after the mailing of the Bar Dates Notice within which to review the Schedules and SOFAs and compare the information contained therein with their own books and records. This timeframe will also provide the Debtors with a sufficient period to assess the universe of claims that must be satisfied by the Debtors' estates prior to confirmation.

**P.** **Motion of the Debtors for an Order Pursuant to Sections 1125, 1126, and 105 of the Bankruptcy Code, Bankruptcy Rules 2002, 3003, 3017, 3018 and 3020, and Local Rule 3017-1 (A) Approving Adequacy of Disclosure Statement, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, (C) Fixing the Administrative Expense Bar Date, (D) Fixing a Record Date for Distribution, (E) Fixing Date, Time and Place for Confirmation Hearing, and (F) Establishing Procedures for Objections to Cure Payments**

166. By this Motion, the Debtors request that the Court enter an order (a) approving the adequacy of the Disclosure Statement as it may be modified or amended, (b) establishing the procedures for solicitation and tabulation of votes to accept or reject the Plan, (c) fixing a bar date for filing administrative expense claims, (d) fixing a record date for distribution, (e) setting a hearing to consider confirmation of the Plan, and (f) establishing procedures for objections to cure payments.

167. As noted above, the Debtors and the Consenting Noteholders have reached an agreement in principle on the terms of a restructuring. Those terms are set forth in the Plan, and described in the Disclosure Statement. In order to facilitate the prompt

resolution of these Cases, Debtors seek to obtain approval of the Disclosure Statement and the procedures for voting and tabulation and to set a timeline for voting on and confirming the Plan. The Debtors believe that the Disclosure Statement contains adequate information, and that the procedures and timeline proposed are consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and are fair, reasonable, and sufficient. In addition, Debtors ask the Court to set an administrative expense bar date and to establish procedures to resolve any objections to proposed cure payments for contracts to be assumed pursuant to the Plan. All of these measures are designed to facilitate Debtors' expeditious emergence from bankruptcy.

168.    I believe that, on balance, the Plan is the best option available to the company under the present circumstances, and that proceeding in this Court at an expeditious pace is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates designed to maximize and to preserve the value of the Debtors' assets and operations for the benefit of their creditors, employees and other parties-in-interest.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

By: _____

Name: J. Mark Borseth

Title:   Chief Financial Officer and
         Executive Vice President