UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CONSTAR INTERNATIONAL INC., <u>et al.</u>,[1] | ) ) ) | Case No. 11-10109 (CSS) |
| Debtors. | ) ) ) | Joint Administration Requested |

**APPLICATION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 327(a) AND 328 AUTHORIZING THE EMPLOYMENT AND RETENTION OF WILMER CUTLER PICKERING HALE AND DORR LLP AS ATTORNEYS FOR THE DEBTORS NUNC PRO TUNC TO THE PETITION DATE**

The above-captioned debtors and debtors in possession (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") hereby move this Court for the entry of an order substantially in the form attached hereto as Exhibit A (the "<u>Order</u>") under sections 327(a) and 328 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") approving the employment of Wilmer Cutler Pickering Hale and Dorr LLP ("<u>WilmerHale</u>") under general retainer as attorney for Debtors, effective as of the commencement of these cases.[2] In support of the Application, the Debtors respectfully represent as follows:

---

[1] The Debtors and the last four digits of their respective tax identification numbers are: Constar International Inc. (XX-XXX9304), BFF Inc. (XX-XXX1229), DT, Inc. (XX-XXX7693), Constar, Inc. (XX-XXX0950), Constar Foreign Holdings, Inc (XX-XXX8591) and C onstar International U.K. Limited. The address of Constar International Inc., BFF Inc., DT, Inc., Constar, Inc. and Constar Foreign Holdings, Inc. is One Crown Way, Philadelphia, Pennsylvania 19154. The address of Constar International U.K. Limited is Moor Lane Trading Estate, Sherburn in Elmet, Nr Leeds, North Yorkshire LS25 6ES, UK.

[2] The facts and circumstances supporting this application (the "<u>Application</u>") are set forth in the concurrently filed Declaration of Andrew N. Goldman of Wilmer Cutler Pickering Hale and Dorr LLP Pursuant to Section 329 of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016 (the "<u>Goldman Declaration</u>") and in the concurrently filed declaration of J. Mark Borseth ("<u>Borseth Declaration</u>").

**Jurisdiction**

1. This Court has jurisdiction over this Application under 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Application in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the statutory predicate for the relief requested herein is section 327(a) and 328 of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Background**

**Business of the Debtor**

2. Constar International Inc., a Delaware corporation ("Constar") headquartered in Philadelphia, Pennsylvania, and its subsidiaries, are a leading global producer of polyethylene terephthalate ("PET") plastic containers, with more than 850 employees and operations in the United States and Europe. Constar produces PET plastic containers for conventional PET applications, such as for soft drinks and water, and custom PET containers designed for food, juices, teas and sport drinks.

3. Constar manufactures PET containers for two product types: conventional PET and custom PET. The conventional PET container business consists of high volume production of containers for use in packaging soft drinks and water. For the first nine months of 2010, conventional PET products represented approximately 69% of Constar's net sales. Custom PET container applications include food, juices, teas and sport drinks. The containers for custom PET applications often employ more complex manufacturing processes, unique materials, innovative product designs and technological know-how. Approximately 26% of Constar's net sales in the first nine months of 2010

related to custom PET containers. The remainder of Constar's net sales during this nine month period related to the sale of plastic closures.

4. Constar's contracts are generally requirements-based, granting all (or a percentage of) the customer's actual requirements for a particular period of time, instead of a specific commitment for unit volume. The typical term for Constar's customer supply contract is three to four years. Constar's largest customer is Pepsi-Cola Advertising and Marketing, Inc. ("Pepsi"). Constar's contract with Pepsi expires on December 31, 2012.

5. The primary raw material and component cost of Constar's products is PET resin, a commodity available globally. The price Constar pays for PET resin is subject to frequent fluctuations resulting from changes in the cost of raw materials used to make PET resin, which are affected by prices of natural gas and oil and its derivatives in the United States and overseas markets, normal supply and demand influences, and, to a lesser extent, seasonal demand. Substantially all of Constar's sales are made pursuant to mechanisms that allow for the pass-through of changes in the price of PET resin to its customers.

## Corporate Structure of the Debtors

6. Constar is the parent of four wholly-owned subsidiaries: BFF Inc., a Delaware corporation, DT, Inc., a Delaware corporation, Constar, Inc., a Pennsylvania corporation, and Constar Foreign Holdings, Inc., a Delaware corporation ("Holdings"). Holdings, in turn, is the parent of three wholly-owned foreign subsidiaries: Constar International Holland (Plastics) B.V., a Dutch *besloten vennootschap* ("Constar Holland"), Constar Plastics of Italy S.r.l. ("Constar Italy"), an Italian *società*

*responsabilità limitata*, and Constar International U.K. Limited, a United Kingdom limited company ("Constar UK").

7.  Constar was an independent publicly-held corporation from 1969 until 1992, when it was purchased by Crown Cork & Seal Company, Inc. ("Crown") and became a wholly-owned subsidiary of Crown. On November 20, 2002, Crown sold 10.5 million shares of its stock in Constar, comprising most of its equity in the company, through an initial public offering (the "IPO"). As described below, since its IPO, Constar has always been a public company and its common stock is listed on the NASDAQ Capital Market under the symbol "CNST."

8.  On May 29, 2009, as described below in more detail, in connection with the consummation of its Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"), Constar cancelled its then-outstanding common stock and issued new common stock in accordance with the Plan. As of January 6, 2010, 1,750,000 shares of Constar's common stock were issued and remain outstanding.

**Prepetition Indebtedness**

9.  The Senior Secured FRNs. On February 11, 2005, Constar completed a refinancing which consisted of the sale of $220 million aggregate principal amount of Senior Secured Floating Rate Notes due 2012 (the "Senior Secured FRNs"). The Senior Secured FRNs, which are outstanding, bear interest at a rate of LIBOR plus

3.375%, with interest payable quarterly and principal maturing February 15, 2012.[3] Constar's obligations under the Senior Secured FRNs are guaranteed by all of Constar's U.S. subsidiaries and its U.K. subsidiary. Substantially all of Constar's property, plants and equipment are pledged as collateral to the Senior Secured FRNs.

10. <u>The GE Credit Facility</u>. On February 11, 2010, Constar entered into a revolving credit facility (the "<u>GE Credit Agreement</u>") with General Electric Capital Corporation ("<u>General Electric</u>") and terminated its then existing credit agreement with Citicorp N.A. The GE Credit Agreement was amended on August 12, 2010. As amended, the GE Credit Agreement provides for up to $75 million of available credit, with a sublimit of up to $20 million for the issuance of letters of credit. Availability under the GE Credit Agreement is limited to a borrowing base calculated as a sum of eligible accounts receivable plus eligible inventory value less certain reserves and adjustments. As of November 30, Constar's borrowing base under the GE Credit Agreement was approximately $46.5 million and its available credit was approximately $15.6 million.

11. Constar pays monthly a commitment fee equal to 0.75% per year on the undrawn portion of the GE Credit Agreement. The effective interest rate for loans under the GE Credit Agreement as of November 30, 2010 was 6.5%. Letters of credit carry an issuance fee of 0.25% per annum of the outstanding amount and a monthly fee accruing at a rate per year of 4% of the average daily amount outstanding.

---

[3] In 2005, Constar entered into an interest rate swap (the "<u>Swap Agreement</u>") for a notional amount of $100 million under which Constar exchanged its floating interest rate for a fixed rate of 7.9%. On February 11, 2010, the counterparty to the Swap Agreement novated its rights under the Swap Agreement to a third party. The fixed payment of the Swap Agreement was also modified from the previous fixed rate of 7.9% to a new fixed rate of 8.17%. Pursuant to the agreement with the majority of the holders of the Senior Secured FRNs discussed below, the Swap was terminated on January 5, 2011.

12. The GE Credit Agreement's scheduled expiration date is February 11, 2013. However, the GE Credit Agreement may terminate earlier if Constar's Senior Secured FRNs are not refinanced at least 90 days prior to their scheduled due date of February 15, 2012, or in the case of an event of default.

13. As of January 4, 2011, the Debtors' prepetition indebtedness for borrowed money consists of:

- $220 million in principal amount of debt consisting of the Senior Secured FRNs;

- Approximately $15.8 million of outstanding borrowings under the GE Credit Agreement;

- Approximately $3.7 million outstanding under undrawn letters of credit; and

- Approximately $10 million owed by Constar UK to Constar Holland.

**Events Leading Up to the Debtors' Chapter 11 Filings**

14. <u>Constar's Prior Restructuring Effort</u>. In the fall of 2008, Constar determined that it had more leverage than its then-current operations could support. As a result, Constar and its representatives began discussions with certain holders of its then-outstanding 11% Senior Subordinated Notes due 2012 (the "<u>Senior Subordinated Notes</u>") with respect to possible restructuring alternatives. These discussions led to the formation of an ad hoc committee of holders of the Senior Subordinated Notes and ultimately resulted in the negotiation of a pre-arranged Plan, which among other things, (a) provided for the conversion of the Senior Subordinated Notes into all of the equity of the reorganized entities, excluding those shares reserved for Constar's management, while (b) leaving the Debtors' trade vendors and the holders of the Senior Secured FRNs unimpaired. The Debtors launched the approval process for this Plan by commencing

Chapter 11 cases in this Court on December 30, 2008. The Plan was confirmed on May 14, 2009 and became effective on May 29, 2009.

15. <u>Decline in Demand</u>. Over the past eighteen months, demand for Constar's conventional PET products has decreased significantly due to a shift to self-manufacturing by Pepsi, which has notified Constar of its intention to increase its self-manufacturing of conventional containers and, consequently, to reduce its requirements for bottles under its supply agreement with Constar. The Company expects the trend of self-manufacturing of containers for carbonated soft drinks to continue, and that, over time, a transition to more and more self-manufacturing of plastic bottles at locations with high transportation costs, large volume and space to install blow-molding equipment will occur. In addition, sales volumes have continued to decline generally and Constar has not been able to offset decreases to conventional PET business by increasing its custom business. As a result of these and other factors, Constar's liquidity has been constrained, which has caused certain vendors to require that Constar pay for purchases in advance, upon delivery, or on shortened credit terms, or to require letters of credit, further constraining liquidity. These liquidity constraints have created customer concern about the Company's long term viability, which has made it difficult to renew contracts or obtain new business.

16. In sum, Constar is now in a position where, even with the more deleveraged balance sheet which resulted from the 2009 restructuring, it does not now believe it can pay off or refinance the Senior Secured FRNs when they mature and maintain adequate liquidity under the GE Credit Agreement to operate its business. Exacerbating the situation is that several critical vendors have reacted negatively to

Constar's most recent filings and have demanded reduced credit terms, letters of credit or cash in advance terms prior to shipping their product to Constar. Those demands have put extreme pressure on the GE Credit Agreement and have created further cash drains on Constar and its subsidiaries.

**Development of Proposed Plan**

17. As a result of the developments outlined above, in July 2010, the Debtors retained Greenhill & Co., LLC as its financial advisor to assist in exploring strategic alternatives and entered into discussions with certain holders of the Senior Secured FRNs (the "Consenting Noteholders"). On or about January 7, 2011, the Debtors and the Consenting Noteholders reached an agreement in principle on the terms of a restructuring whereby Constar and certain of its subsidiaries would file prearranged chapter 11 bankruptcy cases (a) designed to convert most of the Senior Secured FRN indebtedness into equity (leaving those holders with only a relatively modest amount of new debt), and (b) providing for the Company's quick emergence from chapter 11 on this further deleveraged basis.

18. The Debtors and the holders of at least two thirds of the principal amount of the Senior Secured FRNs subsequently entered into a restructuring support and lock-up agreement (the "Restructuring Support Agreement") memorializing their agreement. The Restructuring Support Agreement attaches and incorporates the Debtors' proposed Plan, which incorporates the restructuring contemplated by the Debtors' initial agreement with the Consenting Noteholders. The Restructuring Support Agreement provides that as long as the agreement is in effect, the holders of the Senior Secured FRNs that are parties to the Restructuring Support Agreement will support the proposed Plan, including by timely executing and delivering ballots accepting the Plan. The

Restructuring Support Agreement further provides that the agreement may be terminated upon material breach of the agreement or the failure to satisfy certain conditions or meet certain deadlines in connection with these bankruptcy cases, including the failure to obtain approval of the DIP facility, the Disclosure Statement, or the Plan by certain deadlines set forth in the agreement.

19. Importantly, one or more of the holders of the Senior Secured FRNs have committed to provide debtor in possession financing, a portion of which, upon the satisfaction of certain conditions, may be rolled over (at the election of the provider(s)) into financing that will continue to be available to Constar after it emerges from bankruptcy. The debtor in possession financing will be used to refinance and payoff the GE revolving credit facility and for working capital and operational expenses.

20. As a result of the foregoing developments, the Debtors have filed this day (the "Petition Date") (a) their bankruptcy petitions, (b) first day pleadings relating to relief needed in connection with these bankruptcy filings, (c) Debtors' proposed disclosure statement regarding the pre-arranged plan of reorganization, and (d) a motion for an order setting a hearing date with respect to the proposed disclosure statement.

21. The Debtors intend to prospectively maintain their operations on a "business as usual" basis during the pendency of these Chapter 11 cases.

## Basis For Relief

22. Under Section 327(a) of the Bankruptcy Code, a debtor in possession is authorized to employ one or more attorneys that do not hold or represent an interest adverse to the estate and that are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code, to represent or assist the debtor in carrying

out its duties under the Bankruptcy Code. See 11 U.S.C. §§ 101(14) & 327(a). Section 1107(b) of the Bankruptcy Code modifies Sections 101(14) and 327(a) in cases under chapter 11 of the Bankruptcy Code, providing that a person is not disqualified for employment under Section 327(a) of the Bankruptcy Code by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case. See 11 U.S.C. § 1107(b). Under Section 328 of the Bankruptcy Code, an attorney retained under Section 327(a) may be employed on any reasonable terms and conditions, including on retainer or on an hourly basis. See 11 U.S.C. § 328(a).

23. The Debtors have selected WilmerHale to serve as their general bankruptcy counsel because of its recognized expertise in the field of debtors' protections and creditors' rights, and business reorganizations under chapter 11 of the Bankruptcy Code, as well as all areas of the law that typically arise in the context of a case under chapter 11. In particular, WilmerHale has substantial experience in the representation of debtors and debtors in possession under the Bankruptcy Code.

24. WilmerHale has represented Constar with respect to various matters over the course of several years. Constar first engaged WilmerHale in early 2006 to advise it in connection with negotiations with several customers. WilmerHale was thereafter engaged to advise Constar extensively on patent and intellectual property matters, as well as on securities law disclosures. As a result of these services, WilmerHale has acquired extensive knowledge concerning the Debtors, their operations, and the debtors' industry generally. The Debtors retained WilmerHale in March 2008 to advise them in connection with (i) negotiations with Pepsi regarding potential

modifications to existing agreements, (ii) the potential restructuring and/or modification of the Debtors' debts, liabilities and other obligations, and/or (iii) the financial reorganization of the Debtors. Moreover, WilmerHale previously advised the Debtors as general restructuring counsel with respect to their bankruptcy cases in In re Constar International Inc., No. 08-13432 (Bankr. D. Del. 2008).

25. The professional services that WilmerHale will render to the Debtors include, but shall not be limited to, the following:

(a) advising the Debtors with respect to their powers and duties as debtors in possession and the continued management, operation, and/or wind down or liquidation of their businesses and properties;

(b) attending meetings and negotiating with representatives of creditors and other parties in interest and responding to creditor inquiries and advising and consulting on the conduct of the Debtors' cases, including all of the legal and administrative requirements of operating in chapter 11;

(c) representing the Debtors in connection with any adversary proceedings or automatic stay litigation or contested matters or contested matters that may be commenced in or in connection with these proceedings and any other action necessary to protect and preserve the Debtors' estates;

(d) advising and representing the Debtors in connection with the assumption, assumption and assignment, or rejection of unexpired leases and executory contracts, any sales of assets outside the ordinary course of business, and the financing of their business;

(e) appearing before this Court, any appellate courts, and the U.S. Trustee and protecting the interests of the Debtors before such courts and the U.S. Trustee;

(f) preparing necessary motions, applications, answers, orders, reports, and papers necessary to the administration of the estates;

(g) representing and advising the Debtors in connection with any claims asserted by or against any of the Debtors, and any objections thereto, including, without limitation, the negotiation, settlement and prosecution of such matters;

(h) negotiating and preparing on behalf of the Debtors a plan or plans of reorganization and all related documents and prosecuting the plan or plans through the confirmation process;

(i) representing and advising the Debtors regarding post-confirmation operations and consummation of a plan of reorganization; and

(j) performing all other legal services for and providing all other legal advice to the Debtors which may be necessary and proper in these proceedings, including, without limitation, services or legal advice relating to applicable state and federal laws and securities, labor, commercial, corporate, and real estate laws.

26. By separate application, the Debtors are also seeking to employ the Delaware law firm of Bayard, P.A. ("Bayard") as Delaware counsel in these chapter 11 cases. The Debtors have discussed with WilmerHale and Bayard a division of responsibilities in connection with the representation of the Debtors, and the two law firms will make every effort to avoid unnecessary duplication of services while obtaining maximum advantage from their respective expertise, knowledge of the Debtors' business and proximity to this Court.

27. Partners, counsel, and associates of WilmerHale who will be engaged in the chapter 11 cases and who are not admitted to practice in this Court will, by separate motion, seek admission to this Court *pro hac vice*.

A. <u>WilmerHale's Disinterestedness</u>

28. To the best of the Debtors' knowledge, except as set forth herein or in the Goldman Declaration, WilmerHale (a) is not a creditor, equity security holder or insider of the Debtors, (b) is not and was not, within two years before the Petition Date, a director, officer or employee of the Debtors, (c) does not hold or represent any interest materially adverse to the interests of the Debtors' estates or any class of creditors or equity security holders, and (d) is not related to any judge of this Court, the U.S. Trustee or any employee of the U.S. Trustee in this District. Accordingly, Debtors believe that WilmerHale does not hold or represent any interest adverse to the Debtors' estates and is a "disinterested person" as that phrase is defined in Section 101(14) of the Bankruptcy

Code, as modified by Section 1107(b) of the Bankruptcy Code. See 11 U.S.C. §§ 101(14), 1107(b).

29. WilmerHale proposes to represent all the Debtors. The Debtors' business is operated on a consolidated basis by the Debtors. The Debtors have advised WilmerHale that the interrelationships among the Debtors do not pose a conflict of interest in these chapter 11 cases. WilmerHale believes the Debtors to be correct and knows of no conflict of interest that would preclude joint representation of the Debtors in these chapter 11 cases.

B. Arrangement for Compensation and Reimbursement of WilmerHale

30. The mechanism and understanding between the Debtors and WilmerHale with respect to legal fees is that amounts due to WilmerHale in respect of WilmerHale invoices submitted are satisfied out of the Retainer (as defined below). The amounts paid by the Debtors following the submission of each such invoice are then used to replenish the Retainer.

31. The Debtors paid WilmerHale retainers aggregating to $475,000 to cover fees and costs incurred, and to be held as security for the payment of WilmerHale's services and related expenses (the "Retainer"). WilmerHale has applied the Retainer to cover all weekly pre-bankruptcy billings (and again, has used the payments received from the Debtors to replenish the Retainer). As a result, after application of the Retainer to all pre-bankruptcy billings and replenishment of the Retainer, WilmerHale estimates that as of Petition Date, WilmerHale holds a remaining Retainer of approximately $475,000. This remaining Retainer will cover pre-petition unbilled (or unpaid) fees and costs, and will be held as security for the payment of WilmerHale's post-petition services and related expenses. Any pre-petition fees and costs incurred after January 10, 2011 that

were incurred but not posted in WilmerHale's accounting system as of the filing of these cases will be paid from the retainer with notice to the Court, and so noted in WilmerHale's first quarterly application. The Retainer and other amounts paid to WilmerHale prior to the Petition Date were generated from Debtors' operating revenues and/or borrowings under its line of credit.

32. The Debtors propose to employ WilmerHale under a general retainer because of the variety and complexity of the services that will be required of WilmerHale throughout the case and because the extent of the services is not precisely known at this time.

33. The Debtors understand that WilmerHale intends to apply to the Court for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' chapter 11 cases in accordance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, the Local Rules, the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. §330, and any applicable orders of the Court.

34. The Debtors, subject to approval by this Court, propose to pay WilmerHale its customary hourly rates in effect from time to time as set forth in the WilmerHale Statement. These hourly rates are subject to change from time to time in accordance with WilmerHale's established billing practices and procedures. The Debtors submit that such rates are reasonable and should be approved by the Court, subject to a determination of amounts to be paid to WilmerHale upon application for allowance of compensation. The Debtors, subject to Court approval, also propose to reimburse

WilmerHale for its actual and necessary expenses incurred in representing the Debtors. WilmerHale professionals will maintain detailed records of time and any actual and necessary expenses incurred in connection with the rendering of their services by category and nature of the services rendered.

35. WilmerHale's hourly rates are set at a level designed to fairly compensate it for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses. Hourly rates vary with the experience and seniority of the individuals assigned and may be adjusted by WilmerHale from time to time. It is WilmerHale's policy in all areas of practice to charge its clients for all other expenses incurred in connection with a client's case. The expenses charged to clients include, among other things, photocopying, printing, witness fees, travel expenses, certain secretarial and other overtime expenses, filing and recording fees, postage, express mail and messenger charges, computerized legal research charges and other computer services, expenses for "working meals" and telecopier charges. WilmerHale will charge the Debtors for these expenses in a manner and at rates consistent with charges made generally to its other clients and consistent with the Local Rules and local practices. WilmerHale believes that it is fairer to charge these expenses to individual clients rather than increasing the hourly rates and spreading the expenses among all clients.

## **Conclusion**

36. The services of WilmerHale under a general retainer are necessary in order to enable the Debtors to execute faithfully their duties as debtors and debtors in possession. Based upon its extensive experience and expertise in representing debtors in general, and the Debtors in particular, WilmerHale is both well-qualified and uniquely able to represent the Debtors as debtors and debtors in possession under the Bankruptcy

Code in an efficient, cost-effective and timely manner. If the Debtors were required to retain counsel other than WilmerHale in connection with the prosecution of their chapter 11 cases, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtors' business, operation and capital structure.

### No Prior Request

37. The Debtors have not previously sought the relief requested herein from this or any other Court.

### Notice

38. Notice hereof has been provided to: (a) the Office of the United States Trustee; (b) the Debtors' thirty (30) largest unsecured creditors; (c) counsel to the Debtors' prepetition secured lender; (d) counsel to the Indenture Trustee for the Senior Secured Floating Rate Notes; (e) counsel to the Consenting Noteholders; (f) the Delaware Secretary of State; (g) the Delaware Secretary of Treasury; (h) the Delaware Attorney General; (i) the U.S. Attorney for Delaware; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; and (l) those parties requesting notice pursuant to Bankruptcy Rule 2002 in accordance with Local Rule 2002-1(b) (collectively, the "Notice Parties"). Notice hereof and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

January 11, 2011

CONSTAR INTERNATIONAL INC.
BFF INC.
DT, INC.
CONSTAR, INC.
CONSTAR FOREIGN HOLDINGS, INC.
CONSTAR INTERNATIONAL U.K. LIMITED

By: _____
Name: J. MARK BORSETH
Title: EXECUTIVE VICE PRESIDENT AND
       CHIEF FINANCIAL OFFICER